FILED IN MY OFFICE
DISTRICT COURT CLERK
9/14/2018 2:44 PM
James A. Noel
Catherine Chavez

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT COURT

CELESTINA "SALLY" DURAN, individually
and as Personal Representative of the ESTATE
OF FIDENCIO DURAN, and ROBERT
DURAN,

        Plaintiffs,

v.

Case No.  D-202-CV-2018-06807

UNITED TACTICAL SYSTEMS LLC D/B/A
PEPPERBALL, ADVANCED TACTICAL
SYSTEMS, LLC D/B/A PEPPERBALL,
TIPPMANN SPORTS, LLC, and PERFECT
CIRCLE PROJECTILES, LLC,

        Defendants.

## COMPLAINT FOR WRONGFUL DEATH

Plaintiffs Celestina "Sally" Duran, personally and as the personal representative of the Estate of Fidencio Duran, and Robert Duran, personally, hereby and respectfully bring this Complaint for Wrongful Death and allege the following:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of and parties to this action pursuant to its general jurisdiction.

2. Venue is proper in this district because Plaintiffs are residents of Bernalillo County, New Mexico.

### PARTIES

3. The decedent, Fidencio Duran ("Mr. Duran"), was a lifelong resident of the State of New Mexico, and was living in the County of Bernalillo at the time of his death.

4. Plaintiff Celestina "Sally" Duran is Mr. Duran's daughter and brings this Complaint



EXHIBIT 1

in her capacity as the wrongful death personal representative of the Estate of Fidencio Duran, as ordered in Case No. D-202-CV-2016-00410. On August 31, 2018, out of an abundance of caution, she filed a new petition seeking the same appointment specific to the instant claims. Although the new petition is still pending in case number D-202-CV-2018-06494, she retains her authority as personal representative pursuant to the prior appointment, and that authority has not been challenged

5. Plaintiff Robert Duran ("Robert") is Mr. Duran's son.

6. Both Sally and Robert enjoyed a close and intimate relationship with Fidencio Duran and bring this claim in their individual capacities.

7. Defendant Advanced Tactical Ordnance Systems, LLC ("ATO"), doing business as PepperBall, was a Delaware limited liability company with its principal place of business in Illinois or, possibly, California.

8. Defendant United Tactical Systems, LLC ("UTS"), doing business as "PepperBall," is a Delaware limited liability company with its principal place of business in Lake Forest, Illinois or, possibly California. Defendant UTS is the successor-in-interest to Defendant ATO.

9. Defendant Tippmann is a Delaware limited liability company with its principal place of business in Fort Wayne, Indiana.

10. Defendant Perfect Circle Projectiles, LLC was an Illinois limited liability company with its principal place of business in Lake Forest, Illinois.

11. At all times relevant to this complaint, all Defendants transacted business in the State of New Mexico and derived substantial revenue from the sale of PepperBall Systems and associated training within New Mexico.

## FACTUAL BACKGROUND

A. <u>The PepperBall System</u>

12. At all times relevant to this complaint Defendant ATO sold chemical agent delivery systems branded as "PepperBall."

13. These systems were assembled, marketed and sold by Defendant ATO to law enforcement departments throughout the United States, including the Bernalillo County Sheriff's Office ("BCSO"). They consisted of semi-automatic, high-pressure air guns that used compressed air to propel ball-shaped projectiles containing chemical agents.

14. The PepperBall System that Defendant ATO marketed and sold to BCSO, and which resulted in BCSO killing Mr. Duran, was assembled from three basic components:

[a] the paintball gun, known as the Carbine Launcher, manufactured and supplied by Defendant Tippmann;

[b] the paintball projectiles, manufactured and supplied by Defendant Perfect Circle, ATO's parent company, as described below; and

[c] the chemical agent, called Pelargoinc Acid and Vanillyamine ("PAVA"), or Capsaicin, manufactured by Defendant ATO and encased in Perfect Circle projectiles.

15. ATO marketed and sold its products, identifying Tippmann as the manufacturer of the PepperBall System launcher, to law enforcement throughout the country, including New Mexico, as components of the PepperBall System.

16. In addition, Tippmann distributes its paintball guns for sale in New Mexico and its contacts with the state are continuous and systemic.

17. The PepperBall System was marketed as a safe, effective, and non-lethal use of force to law enforcement intended to fire the PAVA-filled projectile and break apart upon impact,

3

releasing the PAVA.

18. Once released, the PAVA was intended to debilitate the target by provoking the sensations of burning skin, impaired breathing, chest tightness or pain, tearing and closure of the eyes, the secretion of excessive mucous, and the involuntary extension of the hands to the face.

19. According to ATO, the PepperBall System fails in 15% of its intended use. In some instances, this failure rate is the result of the percentage of the population that is immune to PAVA's effects; in others, the failure may be the result of the Pepperballs themselves not breaking apart on impact.

20. The PepperBall System was "rapid fire" insofar as when the trigger was pulled, the gun shot the projectiles out continuously and rapidly. There was no means of tracking how many projectiles were shot out with each pull of the trigger.

B. PepperBall Suppliers

21. Prior to 2012, PepperBall brand products were manufactured by PepperBall Technologies, Inc. ("PTI-1"), Tippman, and Perfect Circle, and sold by PTI-1 to law enforcement agencies as the PepperBall System.

22. On January 9, 2012, Perfect Circle and another entity joined together and purchased PTI-1's tangible and nontangible assets and formed ATO, assuming the operation, ownership, and debt of PTI-1. At this time, Defendant ATO began doing business as PepperBall Technologies, Inc. ("PTI-2")

23. ATO operated PTI-2, supplying PepperBall Systems, including PepperBall irritant projectiles that its parent company, Perfect Circle, continued to manufacture.

24. On July 17, 2014, Defendant UTS acquired all of Defendant ATO's assets, including PTI-1 and 2's assets, and the right to sell PepperBall systems and conduct training, still

4

doing business as PepperBall Technologies, Inc. ("PTI-3").

25. Upon information and belief, when Defendant UTS acquired Defendant ATO, it agreed to assume Defendant ATO's liabilities; the transfer resulted in a consolidation or merger; Defendant ATO continued through Defendant UTS; and/or there was substantial continuity in PepperBall Systems and training before and after Defendant UTS acquired Defendant ATO's assets.

26. On information and belief, Perfect Circle's operations were consolidated into UTS.

27. Perfect Circle, PTI-1, PTI-2, PTI-3, ATO, and UTS have all shared some common management, owners, board members, and addresses.

28. Defendant UTS is a successor-in-interest to Defendant ATO and Perfect Circle.

29. Defendant Tippman allowed the PepperBall System and training to be labeled and marketed in such a way that purchasers, including BCSO, would be reasonably led to believe that this Defendant co-manufactured the PepperBall System or manufactured component parts of the PepperBall System according to its own specifications.

30. The PepperBall System user manual as provided to BCSO bore the "Tippman" brand-label on its cover.

31. When incorporated into the PepperBall System, the Tippman air gun and the Perfect Circle projectiles were substantially unchanged and/or remained in a condition in which they could reasonably have been expected to be used.

C. The PepperBall System's Risks of Serious Injury.

32. When marketed and sold as a paintball gun for paintball games, Tippman's warnings to users includes, but is not limited to:

    [a] the gun is a dangerous weapon;

5

[b] the gun should only be pressurized and loaded immediately prior to use;

[c] users should avoid shooting an opponent at point-blank range (6 feet or less);

[d] when playing the game of paintball, participants should avoid exposing any skin, as even a light layer will absorb some of the impact and protect users from the paintballs; and,

[e] accidental discharge into the eyes could cause permanent injury or death.

33. Generally, paintball guns utilized for paintball games are set to expel the paintballs at an industry standard velocity of 240 to a maximum of 275 feet per second. Tippmann warns that anything over 300 feet-per-second is not recommended.

34. When Tippmann's paintball gun is rebranded and sold with the PepperBall System, however, it is set between 300 and 350 feet-per-second.

35. In addition to the already acknowledged risks of the Carbine Launcher when deploying paintballs for paintball games at a reduced velocity, the PepperBall System posed a number of risks of serious injury or death to individuals targeted by law enforcement, including but not limited to the following:

[a] the risk that a PepperBall projectile coming into contact with an elderly person would penetrate the skin or otherwise cause serious injury;

[b] the risk that a PepperBall projectile coming into contact with bare skin would not break apart but would instead penetrate the skin;

[c] the risk that, due to skin-penetration or other reasons including defective design, the PepperBall chemical agent would fail to deploy;

6

40.     PepperBall Instructor and User Training instructed that in utilizing the PepperBall System law enforcement should follow its department guidelines on use of force against pregnant persons, children, and the elderly, but did not provide any additional instruction or explanation for why that may be.

41.     PepperBall Instructor and User Training instructed that its product would be ineffective on 15% of the population, but it did not provide any additional instruction or explanation for how an officer should account for that failure rate.

42.     The written instructions, warnings, and training materials provided by Defendants to the PepperBall System buyers, including BCSO, contained no warnings about any of the other above-described risks of injury and/or no directions for how to avoid or mitigate such risks.

43.     The written instructions, warnings, and training materials provided by Defendants to the PepperBall System buyers, including BCSO, did not contain the warnings the Carbine Launcher included when the gun was sold for use in paintball games.

44.     Alternatively, the written instructions, warnings, and training materials provided by Defendants to the PepperBall System buyers, including BCSO, contained inadequate warnings about the above-described risks of injury and/or inadequate directions for how to avoid or mitigate such risks.

45.     In the absence of such warnings and directions, the PepperBall System presented an unreasonable risk of injury to targeted individuals, including Mr. Duran.

46.     The above-described risks of injury could have been avoided if Defendants had provided adequate warnings and directions for use.

E.    Misrepresentations about the Safety of PepperBall Systems

47.     In addition to the failures to warn, described above, Defendant ATO affirmatively

8

misrepresented the safety of PepperBall products in its marketing, promotional, and training materials.

48. In particular, and as an example, in its training materials, Defendant ATO represented that "no serious injuries" had occurred during "thousands" of "actual uses" of the PepperBall Systems.

49. This representation was false and/or misleading.

50. In fact, many serious injuries had occurred during and as a result of PepperBall Systems and its component parts.

51. As described above, Tippmann warns that the very same launcher utilized in the PepperBall System is a dangerous weapon, should not be shot at point-blank-range, or on bare skin when selling it to the public for paintball games.

52. In 2008, alone, paintball launchers for paintball games and air guns were reported to have caused approximately 20,000 injuries requiring emergency department visits. Of those visits, open wounds of the extremities, head, neck, and trunk and contusions were the top three complaints, with immunizations and screening for infections coming in fifth.

53. Including, but not limited to the above notice, ATO was aware that PepperBall System itself had caused serious injuries.

54. For example, one international study found that the injuries seen from the PepperBall System had caused severe injuries, including major head injury and vison loss, noting that the severity of skin injuries that occurred with use of PepperBall in two individuals detailed in the study were "far more severe than the safety sheets for the product suggest may occur."

55. In 2004, officers shot a protester in the eye with a PepperBall System that fired PepperBalls at a velocity of 350, causing temporary blindness and permanent loss of visual acuity.

56. In 2006, inmates sued a Colorado county jail for, in part, using the PepperBall System in instances where inmates were non-compliant without warning. That suit alleged that the PepperBall System had caused large, half-dollar sized open welts and bruises and inmates had been scarred months later as a result. The suit further alleged that the use of the PepperBall System on inmates escalated potential conflicts.

57. In 2014, officers deployed PepperBall on a man who held a knife. He had been previously contained, but not compliant. The PAVA had no impact on him, and he became agitated, moving towards the officers for the first time. The officers then shot him.

58. In addition, ATO affirmatively misrepresented that the PepperBall System was "non-lethal," despite Tippman's warning that the same launcher when utilized as a paintball launcher for paintball games was a dangerous weapon and there was a risk of death in using it.

59. Further, ATO claimed the PepperBall System was safe at point-blank range despite Tippman's warning that the same launcher when utilized as a paintball launcher for paintball games should not be deployed point blank.

60. Defendant ATO knew or should have known about the history of serious injuries associated with the use of PepperBall System and its component parts.

F. The Incident

61. On September 15, 2015, the morning after Mabel, his wife of 67 years, died, Mr. Duran was shocked and grief-stricken.

62. At approximately 7:30 a.m., the 88-year-old widower wandered from his home, disoriented.

63. He was partially blind and deaf, and distraught as he roamed shirtless through his neighborhood, dressed only in pants and one shoe.

64. His adult children, Sally and Robert Duran, realized he had left his house and began looking for their father.

65. Mr. Duran wandered, weeping and talking to himself, holding a pocketknife. He eventually knocked on the door of a neighbor asking for help.

66. Concerned, the neighbor called BCSO, asking them to check on Mr. Duran's welfare.

67. Multiple BCSO deputies and supervisors arrived on scene, including Deputies Louis Malherbe ("Deputy Malherbe") and Taylor Rahn ("Deputy Rahn") and Lieutenant Craig Sevier ("Lt. Sevier"). The deputies and supervisors had a variety of weapons with them, including Tasers, beanbags, firearms, and the PepperBall System.

68. On three separate dates in 2012—June 11, 2012, September 9, 2012, and November 6, 2012—BCSO had ordered a total of 33 PepperBall Launchers and other PepperBall System components—including, but not limited to air tanks, air fill kits, and projectiles—from ATO. ATO fulfilled these orders, shipping from San Diego, California to New Mexico.

69. Lt. Sevier received Instructor-Armorer certification directly from PTI-1 in 2009 in Las Cruces, New Mexico.

70. Deputies Malherbe and Rahn received their PepperBall certification following a 2013 training from BCSO instructors, including BCSO Deputy Ramon Martinez ("Deputy Martinez") and BCSO Deputy Robert Kennedy ("Deputy Kennedy") in New Mexico.

71. Deputy Kennedy had received Instructor-Armorer certification training from PTI-1 employees, Monte Scott and Carl Lewis, in New Mexico in 2011. He learned how to utilize the PepperBall System and on training others how to use it.

72. Deputy Martinez had received Instructor-Armorer certification from ATO/PTI-2

11

trainers, Monte Scott and Carl Lewis in New Mexico in 2012 to utilize the PepperBall System and on training others how to use it.

73. Monte Scott currently provides PepperBall System training in New Mexico for UTS/PTI-3.

74. After BCSO deputies arrived at the scene, armed with the PepperBall System and PepperBall training, the grieving and disoriented Mr. Duran stayed within the chain link fence that bordered his neighbor's house.

75. Mr. Duran was "relatively stationary," moving at most a small step in any direction, and never towards BCSO deputies.

76. Deputies ordered Mr. Duran to drop the pocket knife. Confused and afraid, he did not do so.

77. Even assuming Mr. Duran understood deputies' commands to drop the pocket knife, according to deputies, Mr. Duran was "passively resisting" and lethal force or even less than lethal force would not have been justified at that time.

78. Eventually, BCSO supervisors, including Lt. Sevier, developed and executed a plan to use the PepperBall System to disarm Mr. Duran and take him into custody for medical treatment.

79. In discussing their plan, BCSO supervisors rejected other available weapons because those weapons were known to be dangerous for use on the elderly and BCSO actually forbid use of one of the available weapons for the elderly listed in one of its Standard Operating Procedures.

80. The deputies were unaware of the potential that the PepperBalls could break skin.

81. At approximately 10:00 a.m., Deputies Malherbe and Rahn commenced the plan and repeatedly shot Mr. Duran with the PepperBall system, first aiming at the ground.

82. Mr. Duran was among the 15% of the population immune from the effects of PAVA, and the PepperBall System did not have the desired effect on him and instead escalated the previously contained incident, causing him to move towards a deputy for the first time.

83. Deputies Malherbe and Rahn continued to shoot Mr. Duran, closing their distance and eventually shooting him at point-blank range.

84. Many of the PepperBall projectiles tore into Mr. Duran's skin, leaving 18 open gashes on the 88-year-old man and some became embedded completely into Mr. Duran's body.

85. As Deputies Malherbe and Rahn closed distance on Mr. Duran, another deputy deployed his K-9, which knocked Mr. Duran down.

86. At least one of the deputies continued to shoot Mr. Duran after the dog knocked Mr. Duran to the ground.

87. As deputies approached Mr. Duran, the deputies coughed and their eyes watered as a result of the PAVA. Mr. Duran had not reacted similarly.

88. Mr. Duran was hospitalized at the University of New Mexico hospital, where he was diagnosed with a broken pelvis and femur, and numerous plastic shards were removed from wounds on his left arm.

89. Mr. Duran died on October 15, 2015, as a result of his injuries, including wounds caused by the PepperBall System.

90. The Office of the Medical Investigator determined that the manner of death was homicide.

91. In retrospect, Lt. Sevier, who participated in creating the plan to take Mr. Duran into custody, would have liked more information from PTI regarding the danger of utilizing the PepperBall System on the elderly.

92.     The manner in which the BCSO deputies employed the PepperBall System was foreseeable and consistent with the training and instructions they had received from Defendant ATO's successors-in-interest.

93.     To date, UTS continues to market its product as "effective and safe," touting its "squeaky-clean track record" and wrongly represents that there have been no reported fatalities, serious injuries or personal-injury lawsuits that have been filed against PepperBall in its nearly 20-year history.

94.     All allegations contained above and below are hereby incorporated into each of the following counts as though fully set forth therein.

## *COUNT I: STRICT PRODUCTS LIABILITY AGAINST ALL DEFENDANTS*
## *(Failure to Warn and Defective Design)*

95.     Defendants ATO and UTS placed the PepperBall System into the market and sold it to BCSO without adequately warning or instructing buyers, including BCSO, about the PepperBall System's risks of serious injury, including those identified above.

96.     Defendants Tippmann and Perfect Circle allowed their component parts to be used in the PepperBall System and placed into the market and sold to BCSO without adequately warning or instructing buyers, including BCSO, about the PepperBall System's risks of serious injury, including those identified above.

97.     In addition to these omissions, Defendants' inadequate warnings and instructions included, and were aggravated by, the affirmative misrepresentation that no serious injuries had ever been associated with use of PepperBall Systems and that it was safe to deploy at point-blank-range.

98.     The risks of serious injury associated with the PepperBall Systems, including those identified above, were unreasonable and could have been avoided with adequate warnings and/or

instructions.

99. Defendants also sold and distributed the PepperBall System, or allowed it to be sold and distributed, to law enforcement agencies, including BCSO, even though it was unsafe for its intended use by reason of defects in its design, engineering, production and/or assembly, including but not limited to its 15% failure rate and its rapid-firing feature.

100. These defects and failures to provide adequate warnings or instructions constituted, created, and exposed the public to unreasonable risks of serious injury, including those identified above.

101. These unreasonable risks of serious injury were foreseeable and could have been avoided with adequate warnings and/or instructions.

102. Apart from PepperBall's misrepresentations and/or failures to warn, Defendants sold and distributed an unreasonably dangerous product to law enforcement.

103. Taken separately or together, the defects in the PepperBall System and Defendants' failures to provide adequate warnings or instructions to its users, proximately caused Plaintiffs' damages, which include but are not limited to emotional distress, pain and suffering, loss of consortium, loss of enjoyment of life, wrongful death, and loss of chance.

### *COUNT II: NEGLIGENCE AGAINST ALL DEFENDANTS*

104. All Defendants owed a duty to users and human targets of the PepperBall System to use ordinary care in warning and instructing its users to avoid unreasonable risks of injury caused by its foreseeable use.

105. All Defendants owed a duty to users and human targets of the PepperBall System to use ordinary care to design, engineer, produce, test, assemble, and package the product in a manner that was reasonably safe for its foreseeable use.

106. In executing these duties, Defendants were required to possess and apply the knowledge available to reasonably prudent manufacturers, distributors, and sellers.

107. By the use of ordinary care, Defendants knew or should have known about the PepperBall System's risks of serious injury, including those identified above.

108. Defendants breached their respective duties of care by distributing the PepperBall System to law enforcement agencies, including BCSO, without providing adequate warnings or instructions that would have enabled law enforcement officers, including BCSO deputies, to avoid or mitigate the PepperBall System's risks of serious injury, including those identified above.

109. Defendants also breached their respective duties of care by distributing the PepperBall System to law enforcement agencies, including BCSO, even though it was unsafe for its intended use by reason of defects in its design, engineering, production and/or assembly, including but not limited to its frequent failure to deploy the chemical agent and its rapid-firing feature.

110. Defendants' acts and omissions constituted negligence in product design, engineering, production and/or assembly, negligent training, and negligent failure to warn.

111. This negligence proximately caused Plaintiffs' damages, which include but are not limited to emotional distress, pain and suffering, loss of consortium, loss of enjoyment of life, wrongful death, and loss of chance.

## DAMAGES

112. In addition to emotional distress and extreme pain and suffering, Defendants' acts and omissions proximately caused Mr. Duran's wrongful death.

113. Defendants' acts and omissions proximately caused Mr. Duran to lose the opportunity for a better outcome, namely survival, after the incident described above.

114.   Defendants' acts and omissions were willful, wanton, and/or reckless, such that an award of punitive or exemplary damages is warranted to deter Defendants and others from similar misconduct.

115.   Both Sally and Robert enjoyed a close and intimate familial relationship with their natural father, Fidencio Duran, and Defendants' acts and omissions proximately caused them to suffer respective losses of consortium.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray that the Court assume jurisdiction over this matter and award compensatory and punitive damages, pre-judgment and post-judgment interest, costs, and expenses in bringing this action.

Respectfully Submitted,

**KENNEDY KENNEDY & IVES**

*/s/ Laura Schauer Ives*
Laura Schauer Ives
Joseph P. Kennedy
Adam C. Flores
1000 2nd Street NW
Albuquerque, New Mexico 87102
(505) 244-1400 / Fax (505) 244-1406

and

**FINE LAW FIRM**

**/s/ Mark Fine**
Mark Fine
220 9th Street NW
Albuquerque, NM 87102
(505) 243-4541 / Fax (505) 242-2716

*Attorneys for Plaintiffs*

| SUMMONS | |
|---|---|
| SECOND JUDICIAL DISTRICT COURT<br>400 Lomas Blvd., NW<br>Albuquerque, NM 87102<br>505-841-7438 | Case Number:<br>D-202-CV-2018-06807<br>Assigned Judge:<br>Honorable Valerie Huling |
| Plaintiff(s):<br>CELESTINA "SALLY" DURAN, individually and as Personal Representative of the ESTATE OF FIDENCIO DURAN, and ROBERT DURAN,<br><br>v.<br>UNITED TACTICAL SYSTEMS LLC D/B/A PEPPERBALL, ADVANCED TACTICAL SYSTEMS, LLC D/B/A PEPPERBALL, TIPPMANN SPORTS, LLC, and PERFECT CIRCLE PROJECTILES, LLC,<br><br>Defendant(s): | Defendant<br><br>TIPPMANN SPORTS, LLC<br><br>Address:<br>2955 Adams Center Rd.<br>Ft. Wayne, IN 46803 |

**TO THE ABOVE NAMED DEFENDANT(S):** Take notice that

1. A lawsuit has been filed against you. A copy of the lawsuit is attached. The Court issued this Summons.
2. You must respond to this lawsuit in writing. You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA) The Courts address is listed above.
3. You must file (in person or by mail) your written response with the Court. When you file your response, you must give or mail a copy to the person who signed the lawsuit.
4. If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.
5. You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.
6. If you need an interpreter, you must ask for one in writing.
7. You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6657; or 1-505-797-6066.

Dated at _____, New Mexico, this ____ day of **9/28/2018**, 2018.

JAMES A. NOEL
CLERK OF THE DISTRICT COURT

By: _____
Deputy Clerk

*/s/ Laura Schauer Ives*
Laura Schauer Ives
KENNEDY KENNEDY & IVES
1000 2nd Street NW
Albuquerque, NM 87102
Phone: (505) 244-1400 / F: (505) 244-1406
lsi@civilrightslaw.com
*Attorney for Plaintiffs*

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 OF THE NEW MEXICO RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS.

### RETURN[1]

STATE OF _____   )
                           ) ss
COUNTY OF _____  )

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to this lawsuit, and that I served this summons in _____ County on the _____ day of _____, _____, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

**(Check one box and fill in appropriate blanks)**

[ ]   to the defendant _____ (*used when defendant accepts a copy of summons and complaint or refuses to accept the summons and complaint*)

[ ]   to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA (*used when service is by mail or commercial courier service*).

After attempting to serve the summons and complaint on the defendant by personal service or by mail or commercial courier service, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

[ ]   to _____, a person over fifteen (15) years of age and residing at the usual place of abode of defendant _____, (*used when the defendant is not presently at place of abode*) and by mailing by first class mail to the defendant at _____ (*insert defendant's last known mailing address*) a copy of the summons and complaint.

[ ]   to _____, the person apparently in charge at the actual place of business or employment of the defendant and by mailing by first class mail to the defendant at _____ (*insert defendant's business address*) and by mailing the summons and complaint by first class mail to the defendant at _____ (*insert defendant's last known mailing address*).

[ ]   to _____, an agent authorized to receive service of process for defendant _____.

[ ]   to _____, [parent] [guardian] [custodian] [conservator] [guardian ad litem] of defendant _____ (*used when defendant is a minor or an incompetent person*).

[ ]   to _____ (*name of person*), _____, (*title of person authorized to receive service. Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision*).

Fees: _____

_____
Signature of person making service

_____
Title (*if any*)

Subscribed and sworn to before me this _____ day of _____, _____.[2]

_____
Judge, notary or other officer
authorized to administer oaths

_____
Official title

## USE NOTE

    1.    Unless otherwise ordered by the court, this return is not to be filed with the court prior to service of the summons and complaint on the defendant.

    2.    If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1988; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007; by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013.]

FILED IN MY OFFICE
DISTRICT COURT CLERK
9/14/2018 2:44 PM
James A. Noel
Catherine Chavez

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT COURT

CELESTINA "SALLY" DURAN, individually
and as Personal Representative of the ESTATE
OF FIDENCIO DURAN, and ROBERT
DURAN,

        Plaintiffs,

v.                                    Case No.   D-202-CV-2018-06807

UNITED TACTICAL SYSTEMS LLC D/B/A
PEPPERBALL, ADVANCED TACTICAL
SYSTEMS, LLC D/B/A PEPPERBALL,
TIPPMANN SPORTS, LLC, and PERFECT
CIRCLE PROJECTILES, LLC,

        Defendants.

## CERTIFICATE OF NON-ARBITRATION

Plaintiffs notify the Court that pursuant to LR2-603, this matter is not subject to court-annexed arbitration, as plaintiffs are seeking damages in excess of $25,000.00.

Respectfully Submitted,

**KENNEDY KENNEDY & IVES**

*/s/ Laura Schauer Ives*
Laura Schauer Ives
Joseph P. Kennedy
Adam C. Flores
1000 2nd Street NW
Albuquerque, New Mexico 87102
(505) 244-1400 / Fax (505) 244-1406

and

**FINE LAW FIRM**

/s/ **Mark Fine**
Mark Fine
220 9th Street NW
Albuquerque, NM 87102
(505) 243-4541 / Fax (505) 242-2716

*Attorneys for Plaintiffs*