IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CELESTINA SALLY DURAN, Individually and as
Personal Representative of the ESTATE OF
FIDENCIO DURAN; and ROBERT DURAN,

     Plaintiffs,

v.                                         1:18-cv-01062-MV-LF

UNITED TACTICAL SYSTEMS, LLC d/b/a
PEPPERBALL; ADVANCED TACTICAL ORDNANCE
SYSTEMS, LLC d/b/a PEPPERBALL;
and PERFECT CIRCLE PROJECTILES, LLC,

     Defendants.

## MOTION OF DEFENDANTS ADVANCED TACTICAL ORDNANCE SYSTEMS, LLC AND PERFECT CIRCLE PROJECTILES, LLC FOR SUMMARY JUDGMENT

COME NOW Defendants Advanced Tactical Ordnance Systems, LLC ("ATO"), and Perfect Circle Projectiles, LLC ("PCP"), by and through their attorneys of record, Brownstein Hyatt Farber Schreck, LLP (Eric R. Burris) and, pursuant to Fed. R.Civ. P. 56(b) and D.N.M.LR-Civ. 56.1, hereby submit their Motion for Summary Judgment. In accordance with D.N.M.LR-Civ. 7.1(a), counsel for ATO and PCP conferred in good faith with Plaintiffs' counsel, and Plaintiffs oppose this Motion.

## INTRODUCTION

Plaintiffs brought this lawsuit as a result of the death of their father, Fidencio Duran, following an incident between Mr. Duran and the Bernalillo County Sheriff's Office ("BCSO") on September 15, 2015. During that incident, BCSO officers shot Mr. Duran with projectiles from a PepperBall launcher and subsequently deployed a police canine on him. The canine jumped on Mr. Duran, causing Mr. Duran to fall and break his hip. While hospitalized due to his hip injury, Mr. Duran suffered from progressively worsening pneumonia, hypoxia and,

ultimately, cardiac arrest. Mr. Duran passed away in the hospital. Yet Plaintiffs' claims do not revolve around BCSO tactics; the claims do not focus on Mr. Duran's treatment while hospitalized. Rather, this case is about the PepperBall system employed by the BCSO specifically. This case is about a man's death, and it should be approached with attendant gravity, but the PepperBall system did not cause Mr. Duran's death.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must demonstrate the existence of specific facts "showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). On issues for which the nonmovant bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to avoid summary judgment." Mountain Highlands, LLC v. Hendricks, 616 F.3d 1167, 1170 (10th Cir. 2010) (alteration in original) (citation omitted)).

No genuine issue of material fact exists unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 243 (1986). The nonmoving party must do more than show there is "some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586. "[E]vidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006) (citation omitted). Equally, the introduction of self-

serving, contradictory testimony creates nothing more than a "sham fact issue" that will not prevent summary judgment. <u>Franks v. Nimmo</u>, 796 F.2d 1230, 1237 (10th Cir. 1986). Summary judgment is appropriate unless the record taken as a whole demonstrates that a rational trier of fact could find for the nonmoving party. <u>Matsushita</u>, 457 U.S. at 587.

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

For the purposes of this Motion only, PCP and ATO assert the following material facts are undisputed:

**<u>The PepperBall System and Trainings</u>**:

1.      From 2001 to 2014, PCP produced, among other things, inert-based and live-powder projectiles for use by law enforcement agencies. Deposition of Michael Varacins, taken April 15, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit A**, 19:5–14.[1]

2.      Throughout that same time period, various other entities also manufactured these projectiles, including Perfect Circle Paintball, Inc., and Jaycor Tactical Systems, Inc. ("JTS"). Deposition of Gary Gibson, taken April 16, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit B** ["Gibson Dep."] 23:13–21; 38:4–24; 39:13–17.

3.      Due to acquisitions and corporate rebranding, JTS operated under various different names, including PepperBall Technologies, Inc., and PTI PepperBall Technologies, Inc. Gibson Dep. 17:22–24; 135:10–18. PTI also established a subsidiary, PepperBall Technologies CA Inc., as its operating company in California. Gibson Dep. 18:2–9.

4.      ATO is a corporation originally formed by PCP and a company called Tactical

---

[1] Consistent with the Court's instruction in D.N.M.LR-Civ 10.5 not to submit unnecessary exhibit pages, ATO and PCP have incorporated deposition cover pages into the condensed transcript exhibits where it could be done without obscuring cited testimony.

Air Games, Inc. ("TAG"). Gibson Dep. 19:12–24. ATO was formed to purchase the assets of PepperBall Technologies, Inc. Gibson Dep. 88:17–89:7.

5.      In August of 2014, United Tactical Systems, LLC ("UTS") purchased the assets of TAG, PCP , and ATO. Gibson Dep. 130:11-17.

6.      UTS sells PepperBall systems, consisting of a launcher and accessories, projectiles, and training. Gibson Dep. 150:1–7.

7.      The PepperBall projectiles are small, plastic spheres (normally no more than two centimeters in diameter) and are typically filled with a powdered chemical substance. Expert Report of Richard Wyant at 4, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit C**; Deposition of Richard Wyant, taken September 28, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit D** ["Wyant Dep.], 125:3–9 (authenticating Exhibit C, Expert Report of Richard Wyant).

8.      The launcher used by BCSO officers during the incident with Mr. Duran is the SA200 launcher manufactured by Tippman Sports, LLC ("Tippman"). Gibson Dep. 152:18–21.

9.      Prior to the purchase of its assets by UTS in 2014, ATO provided BCSO training in the use of the PepperBall System. Deposition of Karen Buchholz, taken May 4, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit E**, 117:11–24.

10.     This training included an instructor training course which would result in attendees becoming certified to teach a PepperBall system-user training course. Deposition of Nathan Kmatz, taken March 24, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit F** ["Kmatz Dep."], 25:3–20; Deposition of Monte Scott, taken May 5, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit G**, ["Scott Dep."], 33:2–6.

11.     The instructor course covered the PepperBall system's technical components and specifications, tactical considerations, and safety guidelines. It also included a written test and gave participants the opportunity to use the system. Scott. Dep. 32:3–13.

12.     Certified instructors were given user-training materials to employ in their user courses. Scott. Dep. 34:5–7.

13.     The PepperBall user training provided to BCSO officers consisted of a presentation, demonstrations as to loading and unloading the PepperBall system, and firing rounds at paper targets. Kmatz Dep. 28:13–29:2.

14.     The presentation materials used in the PepperBall user course contained various statements or warnings related to the safety of the PepperBall system. The materials stated the use of system had not resulted in serious injuries, and the system was safe to use at point-blank range. PepperBall Techs., User Certification Course (2012) ["User Course"] at D000542, a true and correct copy of the relevant portions of which are attached hereto as **Exhibit H**; Kmatz Dep. at 60:3–15 (authenticating Exhibit H, User Certification Course).

15.     But the materials expressly warn against firing the system at the head, neck, or spine, as doing so could cause "severe, and permanent injury or death." Id. at D000539. The materials also expressly identify bruising, abrasions—including bleeding and tearing of skin— and welts as effects of the direct impact of a PepperBall projectile on a human target. Id. at D000541. Users are taught to consider the need for medical assistance in the event of such injuries. See id. ("Follow your Department's policy regarding medical response and evaluation."). Additionally, the materials warn users the chemical agent used in the PepperBall system may not work on "[m]entally ill, drug abusers, [or] alcoholics," id. at D000543, and white PepperBall projectiles (used to break glass) should not be used on human beings, id. at D000548

The materials make clear the use of white projectiles on human targets is akin to the use of deadly force. See id. at D000549 ("Glass shattering rounds should not be used on humans (unless deadly force can be justified).").

16.     The materials also advise users to follow any department-specific guidelines as to use of the system on the elderly. Id. at D000547.

17.     As a result of the training, BCSO deputies knew, for example, not to fire the PepperBall system at a target's face or neck due to the increased risk of serious injury. Deposition of Tyler Rahn, taken March 23, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit I** ["Rahn Dep."], 22:3–12.

18.     During the time period relevant to this case, the BCSO had no policy on the use of the PepperBall system on the elderly. Kmatz Dep. 74:7–18.

19.     BCSO maintained different types of PepperBall projectiles, including white, red, and purple projectiles. Kmatz Dep. 43:2–11; User Course at D000548.

20.     The white projectiles were meant for glass breaking and not to be used on a person. The solid red projectiles were filled with pelargonic acid vanillylamide ("PAVA"). The purple PepperBall projectiles were meant for use in trainings. Kmatz Dep. 43:2–11, 44:16–20; User Course at D000548.

**The Incident with Mr. Duran**

21.     During the subject incident, Mr. Duran wielded a knife and was yelling something to the effect of "kill me." He wore no shirt and was not responding to commands from BCSO officers. BCSO officers believed Mr. Duran posed an immediate risk of harm to them. Deposition of Aaron Velarde, taken March 24, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit J** ["Velarde Dep."], 21:2–22; 25:4–8; 36:20–24.

22.     A psychiatrist who examined Mr. Duran later that day found him to be disoriented, severely agitated, and exhibiting signs of delirium. Declaration of Jeffrey Schwartz, M.D., dated October 28, 2020, a true and correct copy of which is attached hereto as **Exhibit K** "Schwartz Decl."], Ex. 1 at 1.

23.     BCSO ruled out various methods of subduing Mr. Duran, including Taser, pepper spray, and beanbags, before settling on the PepperBall system and a muzzled canine. Deposition of Craig Sevier taken April 7, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit L** ["Sevier Dep."], 47:4–10; 48:7–15; 50:24–51:2.

24.     In particular, BCSO ruled out firing bean bags at Mr. Duran due to the substantial risk of causing him injury, given with which the beanbags impact their targets and Mr. Duran's advanced age. Servier Dep. 48:7–22. Because Mr. Duran was wielding a knife, BCSO also ruled out methods which would have required officers to be close to Mr. Duran in order to deploy them. Servier Dep. 47:6–10.

25.     BCSO deployed the PepperBall system at Mr. Duran, but never deployed it within eight feet of him. Rahn Dep. 23:22–24.

26.     Following the incident, local residents identified what appeared to be purple or blue shells from the projectiles used by the BCSO. Deposition of Josie Ewing, taken May 13, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit M**, 37:3–19. An analysis of Mr. Duran's wounds following the incident suggests BCSO officers potentially used glass-breaking projectiles in addition to standard projectiles. With respect to some wounds, the depth of projectile penetration (one of which appeared to have fully penetrated the skin) and lack of white residue suggested use of a glass-breaking projectile. Wyant Dep. 90:12–92:17.

27.     Mr. Duran showed no reaction to the projectiles and began to close on the BCSO officers. Velarde Dep. 49:4–14; Rahn Dep. 23:12–16.

28.     When the PepperBall system failed to subdue Mr. Duran, a canine was deployed, which knocked Mr. Duran to the ground. Velarde Dep. 49:18–25, 50:25–51:7.

29.     The fall broke Mr. Duran's hip. Declaration of Lee Ann Grossberg, M.D., dated October 29, 2020, a a true and correct copy of which is attached hereto as **Exhibit N** ["Grossberg Decl."], Ex. 1 at 3.

30.     At the time of his altercation with the police on September 15, 2015, Mr. Duran had severe underlying emphysema and arteriosclerosis. Schwartz Decl. Ex. 1 at 4.

31.     Mr. Duran suffered lacerations of his arms and a hip fracture from the police dog used to subdue him, and he also suffered superficial wounds to his arms and torso from the PepperBall system. Id.; Grossberg Decl. Ex. 1 at 3. An embedded projectile had to be removed from Mr. Duran's arm. Deposition of Aditi Majumdar, M.D., taken on April 24, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit O**, 6:21–7:3. Mr. Duran was hospitalized because of said injuries. Schwartz Decl. Ex. 1 at 4.

32.     The primary cause of Mr. Duran's death was worsening pneumonia, which caused hypoxia and likely caused cardiac arrest. Id.

33.     Mr. Duran's post-injury course of treatment was complicated by a coma and prolonged respiratory failure requiring mechanical ventilatory support and a tracheostomy. Id.

34.     Mr. Duran's respiratory failure was secondary to his pre-existing emphysema and recurrent pneumonia and his progressive pneumonia was evident from a chest x-ray taken on October 15, 2015, and later from his autopsy. Id.

35.     Mr. Duran's recurrent pneumonia was secondary to his debility from his hip

fracture, his altered mental status leading to recurrent aspiration, and the known propensity for pneumonia to develop in patients with a tracheostomy tube requiring mechanical ventilatory support. Id.

36. The wounds resulting from the projectiles fired from the SA200 launcher required debridement at UNM Hospital and routine wound care. However, there is no evidence from any of the many providers who cared for Mr. Duran at UNM Hospital and AMG Specialty Hospital that these superficial and gradually healing wounds were thought to be a cause of his altered mental status, his prolonged respiratory failure, or his recurrent pneumonia. Id.

37. Mr. Duran's autopsy confirmed the wounds he sustained from the projectiles were superficial and healing and there is no pathophysiologic mechanism that would tie these healing, superficial wounds to his death resulting from his recurrent hypoxic respiratory failure and pneumonia. Id.

38. There is no medical basis to list these superficial wounds from the projectiles as a contributing cause of Mr. Duran's death one month after sustaining said injuries. Id.

**Present Case:**

39. Plaintiffs filed their Amended Complaint for Wrongful Death on November 9, 2018. See Docket.

40. Plaintiffs allege claims for strict products liability and negligence. Am. Compl. ¶¶ 95-115.

41. Plaintiffs' claim for strict products liability is based on allegations UTS and ATO placed the PepperBall system into the market and sold it to BCSO without warning or instructing of its risks. Plaintiffs allege PCP allowed their component parts to be used in the PepperBall system without adequate warnings. Lastly, they allege all of the Defendants allowed the

PepperBall system to be sold and distributed even though it was defective by design. Id. ¶¶ 95-99.

42.     Plaintiffs' claim for negligence is based on allegations all of the Defendants owed and breached a duty regarding the PepperBall system to use ordinary care in warning and instructing its users and in designing the system. Id. ¶¶ 104-105.

43.     Plaintiffs' expert, Charles Mesloh, provided information in his expert report regarding the SA200 and projectiles. His opinions as to PepperBall systems was based on research he had done in the past over a four-year period into various PepperBall systems. Expert Report of Charles Mesloh, Ph.D ["Mesloh Expert Report"] at 11, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit P**; Deposition of Charles Mesloh, Ph.D, taken on August 10, 2020, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit Q** ["Mesloh Dep."], 113:15–114:7 (authenticating Exhibit P, Mesloh Expert Report).

44.     Dr. Mesloh opined the projectiles he studied climbed unpredictably when fired and spread in an inconsistent manner. Mesloh Expert Report at 11–12. Beginning at a distance of fifteen feet, Dr. Mesloh observed the inaccuracy of the PepperBall system increased proportionately with the distance between the shooter and the target. Id. at 12.

45.     Dr. Mesloh attributed this poor flight performance to particular deficiencies with the projectiles, namely the small cap at the top of the sphere being inadequately attached and the two halves of the shells slightly overlapping. Id. at 13–14.

46.     However, Dr. Mesloh's research was not specific to projectiles manufactured by a specific entity or at a specific time. Dr. Mesloh could not say whether all of the projectiles he studied were made by the same company; he did not know if the projectiles were manufactured

using the same process as the projectiles at issue in this matter; and he did not know in what year the projectiles he studied were manufactured. Mesloh Dep., 156:23–157:3; 168:18–169:09.

47.      Dr. Mesloh also stated the defects he observed occurred only in around 5 or 6 out of every 100 projectiles he used in this studies. Mesloh Dep. 169:10–15.

48.      Nor could Dr. Mesloh tie his research to the facts of this case. He did not know and could not determine if the projectiles he studied were the same as those used in the incident with Mr. Duran; he had minimal familiarity with PCP and what it manufactured; and he did not even know what type of projectiles were launched against Mr. Duran. Mesloh Dep. 124:17–125:5; 125:22–126:1; 153:16–22.

## ARGUMENT

Plaintiffs assert claims against ATO and PCP for strict products liability and negligence. As discussed below, Plaintiffs cannot establish disputed issues of material fact necessary to withstand summary judgment.

### I.      Plaintiffs' Claim for Strict Products Liability Fails As a Matter of Law.

Plaintiffs' strict products liability claim is comprised of four primary allegations: (1) ATO and PCP allowed the PepperBall system to be sold to BCSO even though it had a defective design; (2) ATO placed the PepperBall system in the market and sold it to BCSO without adequately warning of its risks; (3) ATO and PCP misrepresented that no serious injuries have been associated with the PepperBall system and it is safe to use at point blank range; and (4) PCP allowed its component parts, namely the projectiles, to be used in the PepperBall system and sold to BCSO without warning or instructing of its risks. Am. Compl. ¶¶ 95-99.

Strict products liability applies to three types of defects: design, manufacturing, and marketing (i.e., warnings). Morales v. E .D. Etnyre & Co., 382 F. Supp. 2d 1252, 1265 (D.N.M.

2005). But to succeed on their strict products liability claim, Plaintiffs must do more than  show

a defect. As is pertinent to the facts of this case, Plaintiffs must also prove a defect in the

PepperBall system created an unreasonably dangerous risk of injury, and the defect was the

proximate cause of the injury for which Plaintiffs seek relief. See Rimbert v. Eli Lilly & Co., 577

F. Supp. 2d 1174, 1201–02 (D.N.M. 2008).

The unreasonable risk of injury prong reflects a view that strict products liability does

not attach simply because an object is dangerous. See Bustos v. Hyundai Motor Corp., 2010-

NMCA-090, ¶ 53, 149 N.M. 1, 243 P.3d 440 ("[A] product does not present an unreasonable risk

of injury simply because it is possible to be harmed by it." (citation omitted)). Instead, a

product's risk of injury is only unreasonable where "a reasonably prudent person having full

knowledge of the risk would find [it] unacceptable." Id. As for causation, the test for causation

varies depending on the type of defect alleged, see Mims v. Davol, Inc., No. 2:16-CV-00136-

MCA-GBW, 2017 WL 3405559, at *4 (D.N.M. Mar. 22, 2017) (noting additional causation

requirements for failure to warn claims), as will be discussed infra. But it is sufficient to note

here, to withstand summary judgment, Plaintiffs must "produce sufficient evidence, viewed in

the light most favorable to [their] position, from which a reasonable juror could find in [their]

favor on the issue of causation." Huber v. Armstrong World Indus., Inc., 930 F. Supp. 1463,

1465 (D.N.M. 1996).

### a.    Plaintiffs Cannot Prove A Design Defect.

Products sold and used in New Mexico need not represent "the ultimate in safety."

Bustos, 2010-NMCA-90, ¶ 53 (citation omitted). Accordingly, to assess whether a defendant

defectively designed a product, New Mexico courts employ the "risk-utility" test. Morales v.

E.D. Entyre & Co., 382 F. Supp. 2d 1278, 1283 (D.N.M. 2005). Under this test, a factfinder must

consider the ability to eliminate a product's risks without seriously impairing its usefulness or making it unduly expensive. Brooks v. Beech Aircraft Corp., 1995-NMSC-043, ¶ 32, 120 N.M. 372, 902 P.2d 54. The inquiry is meant to "focus jury attention on evidence reflecting meritorious choices made by the manufacturer on alternative design and so as to minimize the risk that the public will be deprived needlessly of beneficial products for the sake of compensating injured victims." Id. To that end, "the existence of a reasonable alternative design is a relevant consideration." Bustos, 2010-NMCA-90, ¶ 54.

Plaintiffs cannot meet their burden of showing a defective design so as to avoid summary judgment. As a threshold matter, the Amended Complaint alleges the PepperBall system's chemical agent failed to deploy and the rapid firing feature caused an excessive number of projectiles to be fired from the system. Am. Compl. ¶ 35. But Plaintiffs have come forward with no evidence to support their claim the PepperBall system was defective for these reasons.

More broadly, Plaintiffs' only evidence of a design defect came from Dr. Mesloh, who opined the projectiles he studied climbed unpredictably when fired and spread in an inconsistent manner. Fact No. 44. Beginning at a distance of fifteen feet, Dr. Mesloh observed the inaccuracy of the PepperBall system increased proportionately with the distance between the shooter and the target. Id. Dr. Mesloh attributed this poor flight performance to particular deficiencies, namely the small cap at the top of the sphere being inadequately attached and the two halves of the shells slightly overlapping. Fact No. 45.

Dr. Mesloh's evidence is inadequate to meet Plaintiffs' burden for three reasons. First, Dr. Mesloh does not attribute the supposed defects to any design element. In fact, during his deposition, Dr. Mesloh testified the defects he identified were present in only 5 or 6 out of every 100 projectiles used in his studies. Fact No. 47. The sporadic occurrence of these defects point to

a possible manufacturing defect, not a design defect. <u>See</u> Restatement (Third) of Torts: Prods. Liab. § 2 cmt. c (Am. Law Inst. 1998) ("[A] manufacturing defect is a departure from a product unit's design specifications . . . . Common examples of manufacturing defects are products that are physically flawed, damaged, or incorrectly assembled."). <u>Second</u>, Plaintiffs have offered no evidence in support of the risk-benefit analysis by which the supposed design defect should be assessed, in particular how ATO and PCP might eliminate the risks of the alleged defects, or the existence of possible alternative designs.

But <u>third</u>, Dr. Mesloh also testified in his deposition he did not know who manufactured the projectiles he used in his studies; if the projectiles were manufactured using the same process as the projectiles at issue in this matter; or in what year the projectiles he studied were manufactured. Fact No. 46. Dr. Mesloh did not know what kind of projectiles were used against Mr. Duran, and he did not know if they were the same kind of projectiles he used in his studies. Fact No. 48. Thus, Dr. Mesloh's report provides no reliable evidence of a design defect of the projectiles at issue in this matter, and it is not clear his report offers relevant evidence on any issue related to the projectiles in this case. Based on the undisputed evidence, no rational juror could conclude the projectiles used on Mr. Duran were subject to a design defect. Perhaps a rational juror could conclude some PepperBall projectiles, somewhere, as a generally proposition, were subject to those defects—but <u>not</u> the projectiles used in the incident with Mr. Duran. As a result, summary judgment in favor of ATO and PCP is warranted as to Plaintiffs' design defect claim.

   **b.**  **ATO and PCP are Entitled to Judgment as a Matter of Law on Plaintiffs' Failure to Warn Claim.**

Plaintiffs allege the PepperBall system was defective due to inadequate warnings.

Amend. Compl. ¶¶ 95-99. As strict products liability claim, failure to warn is tied to a product's unreasonable risk of injury. "Where the manufacturer has reason to anticipate that a danger may result from a particular use, the manufacturer may be required to give an adequate warning. A product sold without such a warning would be in a defective condition . . . and would be unreasonably dangerous . . . ." Schrib v. Seidenberg, 1969-NMCA-078, ¶ 25, 80 N.M. 573, 458 P.2d 825 (citations omitted).

But a warning is not always necessary. Notably, a manufacturer of a product has no duty to warn of the product's obvious dangers. Villanueva v. Nowlin, 1966-NMSC-248, ¶ 9, 77 N.M. 174, 420 P.2d 764. Relatedly, another judge of the United States District Court for the District of New Mexico found New Mexico courts would adopt the "sophisticated-user" defense to failure-to-warn liability. See Bellman v. NXP Semiconductors USA, Inc., 248 F. Supp. 3d 1081, 1142 (D.N.M. 2017) (Browning, J.). Under this defense, when the user of a product knows or has reason to know of the product's hazards, the duty to warn is discharged. Id. at 1139.

Bellman involved a claim for negligent failure to warn, not the strict products liability claim Plaintiffs assert here. See id. at 1142. Still, Bellman's reasoning for finding New Mexico courts would adopt the sophisticated-user defense in negligent failure to warn claims applies equally to strict liability claims. Bellman relied on the New Mexico Supreme Court's adoption in Villanueva of the principles espoused in Restatement (Second) of Torts § 388 (Am. Law Inst. 1965), including "[i]f . . . defendant did have reason to believe plaintiff would realize the dangerous condition, then defendant was not required to inform plaintiff of the condition." Villanueva, 1966-NMSC-248, ¶ 7; see also Bellman, 248 F. Supp. 3d at 1138–39. As the Bellman court observed, various jurisdictions have interpreted the comments to Restatement (Second) of Torts § 388 as establishing a "sophisticated-user" defense. See Bellman, 248 F.

Supp. 3d at 1139–40 (collecting cases).

In the context of strict products liability claims, New Mexico law embraces Villanueva's conclusion as to the relationship between a user's knowledge of a product's danger, and a manufacturer/supplier's duty to warn of that danger. Most clearly, citing Villanueva and various other authorities, the New Mexico Supreme Court has held, "[t]here is no duty to warn of dangers actually known to the user of a product, regardless of whether the duty rests in negligence . . . or on strict tort liability." Garrett v. Nissen Corp., 1972-NMSC-046, ¶ 16, 84 N.M. 16, 498 P.2d 1359, overruled on other grounds by Klopp v. Wackenhut Corp., 1992-NMSC-008, ¶ 12, 113 N.M. 153, 814 P.2d 293. Combining Villanueva and Garrett, UJI 13-1415 NMRA—which applies to claims for both negligent and strict liability failure to warn—provides a supplier has no duty to warn of risks the suppler "can reasonably expect to be obvious or known to foreseeable users of the product."[2] Because the principles underlying a sophisticated-user defense in negligent failure to warn claims apply equally to the same claims under a strict product liability theory, the Court should find New Mexico courts would adopt a sophisticated-user defense applicable to strict products liability failure to warn claims.

So adopted, ATO and PCP cannot be liable for failing to warn of the dangers inherent in the PepperBall system because the BCSO—the ultimate users in this case—were sophisticated users of the PepperBall system. "Sophistication" for these purposes encompasses familiarity with a product beyond a general knowledge of the product and how it is used. Nearhood v. Anytime Fitness-Kingsville, 178 So. 3d 623, 626 (La. Ct. App. 2015). This familiarity can derive from various sources, including experience with the product, specialized training, or warnings of

_____

[2] Although not binding authority, New Mexico's Uniform Jury Instructions demonstrate the state of the substantive law on the issue instructed. See State v. Campos, 1996-NMSC-043, ¶ 63, 122 N.M. 148, 921 P.2d 1266 (Franchini, J., dissenting) ("Jury instructions . . . are controlled by and are a reflection of statutory and common law . . . .").

particular dangers. See, e.g., Mich. Comp. Laws § 600.2945(j) (2020) (defining "sophisticated user" for the purposes of Michigan's products liability laws as, inter alia, "a person or entity that, by virtue of training, experience, a profession, or legal obligations, is or is generally expected to be knowledgeable about a product's properties, including a potential hazard or adverse effect"). In Carrel v. Nat'l Cord & Brad Corp., the plaintiff was injured during a zip-line course provided by a regional authority of the Boy Scouts of America ("BSA"). 852 N.E.2d 100, 103 (Mass. 2006). As to plaintiff's claim against the manufacturer of the bungee cord used in the course, the court adopted the sophisticated user doctrine as an affirmative defense in product liability actions and found the trial court properly put the defense before the jury where evidence showed the BSA (the end users) conducted training courses, had national safety standards, employed specialists to ensure compliance with those standards, employed a certified instructor during the course at issue, and received a warnings about the danger at issue when ordering the bungee cords. Id. at 104, 111.

Here, the undisputed evidence shows BCSO and its officers had more than a mere general knowledge of the PepperBall system. BCSO officers went through specialized training in the use of the system. See, e.g., Fact No. 13. Relevant here, the materials used in said training expressly warn against firing the system at the head, neck, or spine, as doing so could cause "severe, and permanent injury or death." Fact No. 15. The materials also warn of risks of bruising, abrasions—including bleeding and tearing of skin—and welts, which may require medical assistance. Id. Additionally, the materials warn trainees the chemical agent used in the PepperBall system may not work on "[m]entally ill, drug abusers, [or] alcoholics," and white PepperBall projectiles (used to break glass) should not be used on human beings. Id.. In addition to the user training officers received, some BCSO officers went through a special certification to

train their peers in the use of the PepperBall system. <u>See</u> Fact No. 10. The instructor training covered topics including the technical components of the PepperBall system, safety guidelines, actual use of the system, and a written exam. Fact No. 11. Ultimately, there is insufficient evidence to create an issue of material fact as to whether the BCSO was a sophisticated user of the PepperBall system.

Even if BCSO were not a sophisticated user (or if the Court finds the sophisticated-user defense does not apply), the undisputed evidence shows ATO and PCP discharged their duty to warn as a matter of law. Where a warning is required, it must have at least three characteristics. The warning must: (1) be in a form that can reasonably be expected to catch the attention of the reasonably foreseeable user of the product; (2) be understandable to the reasonably foreseeable user of the product; and (3) disclose the nature and extent of the danger. <u>Magoffe v. JLG Indus., Inc.</u>, No. CIV 06–0973 MCA/ACT, 2008 WL 2967653, at *10–11 (D.N.M. May 7, 2008). As to the third of these characteristics, "there must be specified any harmful consequence which a reasonably foreseeable user would not understand from a general warning of the product's danger [or] from a simple directive to use or not to use the product for a certain purpose or in a certain way." <u>Id.</u> at *11 (alteration in original) (citation omitted).

ATO provided the instructor certification training described above, as well as the materials used to train BCSO officers in the use of the PepperBall system. <u>See</u> Facts Nos. 9, 12. The warnings were in a form expected to catch the attention of BCSO officers, and the materials could be understood by them. For example, in his deposition, Tyler Rahn recalled being trained not to fire the PepperBall system at a target's face or neck due to the increased risk of serious injury. Fact No. 17. As for the disclosure of the nature and extent of the danger, the materials emphasize the use of the system can cause numerous injuries—including abrasions, laceration,

and bleeding (all possibly requiring medical attention); and even death if someone is struck in the neck or face with a projectile. Fact No. 15.

Plaintiffs will likely argue the trainings were wrong or misleading, pointing to a slide in the course materials stating the system is safe to use at point-blank range and use of the system had not resulted in serious injuries occurred and argue this was wrong or misleading. Fact No. 14. Such arguments are either misplaced or overstated. Notably, BCSO officers shot Mr. Duran from no closer than eight feet—they did not shoot him at point-blank range.[3] Fact No. 25. But more fundamentally, context matters. That no one had been seriously injured by use of the PepperBall system does not dilute the unambiguous warnings about the system's risks found throughout the training materials. No rational person would view the lack of past serious injuries as condoning firing the system at a target's face, given the express warning about the serious injuries or death which could result from that action. Similarly, it is illogical—and, indeed, no reasonable person would conclude—the risk of puncturing someone's skin from, say, five feet away, is somehow lessened by pressing the nozzle of the gun to the person's skin; or that getting struck in the face with a projectile is somehow more lethal when the projectile is shot from five feet away than it is when fired at point-blank range.

Finally, Plaintiffs may fault the training materials for not taking a position on the use of the PepperBall system on the elderly. Fact No. 16. Plaintiffs have not adequately shown the PepperBall system presents risks specific to the elderly as a demographic. In the absence thereof, the materials remind users of the potential applicability of broader policies concerning use of force while deferring to the judgment of the users' respective agencies. Indeed, such

---

[3] This fact alone would preclude liability on a failure to warn claim based on use of the system at point blank range, as the failure to give such a warning could not possibly have caused Mr. Duran's death.

considerations were weighed with respect to Mr. Duran. BCSO did not have a policy on the use of the system on the elderly. Fact No. 18. But BCSO ultimately made a choice to use the PepperBall system when other options would have clearly caused substantial harm to Mr. Duran or put BCSO officers at an unreasonable risk of danger. Facts Nos. 23–24. Absent a sufficiently clear risk—such as the risk of substantial injury when an target is struck in the face with a projectile—ATO was not wrong to defer to agencies when making such difficult decisions.

In the end, the PepperBall system at issue was accompanied by a thorough instruction and training regime which made clear the various risks of harm attendant with the system. Although PCP and ATO maintain they had no duty to warn on account of BCSO's sophistication, the training and instruction satisfied any duty to warn they had under New Mexico law. As with the evidence of the BCSO's sophistication, the evidence leading to this conclusion is such that no rational juror could conclude otherwise.

      c.      **Plaintiffs Failed to Establish PCP allowed its Component Parts to Be Used in the PepperBall System Without Adequate Warnings.**

If Plaintiffs can prove that PCP manufactured the projectiles utilized in the incident with Mr. Duran, then PCP manufactured no more than a component part in the PepperBall system at issue here. However, the scope of strict products liability for component part manufacturers is narrow. "A component part manufacturer is strictly liable if the component part was unreasonably dangerous at the time it left the manufacturer's control." Pac. Indem. Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d 1216, 1228 (D.N.M. 2006). As discussed supra, a product is unreasonably dangerous (i.e., it creates an unreasonable risk of injury) when "a reasonably prudent person having full knowledge of the risk [of injury] would find [the risk] unacceptable." Bustos, 2010-NMCA-090, ¶ 53. Where a component part is not unreasonably dangerous when it

leaves the manufacturer's control, not even the down-stream supplier of the component part has a duty to warn users of the "suitability or safety of the finished product." Therm-O-Disc, Inc., 476 F. Supp. 2d at 1228. Indeed, "the component part manufacturer [does not] have a duty to foresee all the dangers that may result from the subsequent manufacture of a product that incorporates the component part into a finished product." Id.

As discussed further in the next section, Plaintiffs cannot demonstrate PCP's projectiles were used in the incident involving Mr. Duran. Even if they were, there is inadequate evidence to show the projectiles were defective when they left PCP's control. The projectiles themselves are innocuous—they are small, plastic spheres (no more than two centimeters in diameter) and contain a powdered chemical agent. Fact No. 7. There has been no contention in this case the projectiles, on their own, are unreasonably dangerous. As discussed previously, Plaintiffs' expert identified in his studies projectiles exhibiting apparent defects which can impact a projectile's flight pattern. See Facts Nos. 44–45. Such defects, however, were rarely observed (no more than 6 out of every 100 projectiles), Fact No. 47, and there is no evidence establishing the projectiles used against Mr. Duran suffered those defects, Fact No. 48; see also Bustos, 2010-NMCA-090, ¶ 53 (when considering whether a product creates an unreasonable risk of injury, a jury may only consider "the risks of harm from [the product's] condition or from the manner of its use at the time of the injury" (citation omitted)).

Plaintiffs cannot show the projectiles at issue were unreasonably dangerous when they left PCP's control—if PCP manufactured the projectiles at all. Therefore, PCP, as a component manufacturer, is not subject to liability for failing to warn of dangers caused by the projectiles' ultimate use. Summary judgment should issue in PCP's favor.

###### d.   Even if There Were a Design Defect or Duty to Warn Exists, Plaintiffs Failed to Establish Proximate Cause.

Whether based on design defect or failure to warn, to withstand summary judgment on their strict products liability claim, Plaintiffs must "prove . . . the defective product was the proximate cause of the injury or damage." <u>Therm-O-Disc, Inc.</u>, 476 F. Supp. 2d at 1223–24. Although proximate cause is ordinarily a question of fact, it becomes a question of law when the "facts are undisputed and there is no evidence from which a jury could reasonably find a causal connection between the allegedly [tortious] act and the injury." <u>Eck v. Parke, Davis & Co.</u>, 256 F.3d 1013, 1023 (10th Cir. 2001) (citation omitted).

What constitutes proximate cause in a strict products liability claim varies depending on the defect alleged. With respect to all defects, a defective product "causes" an injury if it contributes to bringing about the injury, and if the injury would not have occurred without it. <u>Mims</u>, 2017 WL 3405559, at *4. "To be a 'cause,' the defective product must be reasonably connected as a significant link to the" injury. <u>Id.</u> (citation omitted). With respect to inadequate warnings, "causation as to that issue must additionally be shown by evidence that 'in light of all the circumstances . . . an adequate warning . . . would have been noticed and acted upon to guard against the danger.'" <u>Id.</u> (citation omitted).

Initially, Plaintiffs cannot establish causation as to PCP because there is insufficient evidence PCP's projectiles were used in the incident involving Mr. Duran. Since 2001, there have been numerous entities which have produced PepperBall projectiles. Facts Nos. 1–3. Plaintiffs' expert, who spent several years studying projectiles used in PepperBall systems, could not distinguish between projectiles used in his studies and those used in the incident with Mr. Duran. Facts Nos. 43, 48. BCSO had numerous different types of PepperBall projectiles, Facts

Nos. 19–20, and evidence suggests BCSO may have used standard, training, and glass-breaking rounds on Mr. Duran, Facts Nos. 20, 26. There is no non-speculative evidence PCP's projectiles were used in the incident involving Mr. Duran. PCP's allegedly defective product could not have caused Mr. Duran's injuries if they were never used against him; accordingly, summary judgment should be granted in PCP's favor.

As noted above, the evidence in this case shows BCSO used more than standard projectiles during the incident with Mr. Duran. A witness identified what she believed to be purple shell fragments near the incident, and an analysis of Mr. Duran's wounds—some of which suggest full penetration of the skin—indicates he was struck with white, glass-breaking projectiles. Fact No. 26. Indeed, an embedded projectile had to be removed from Mr. Duran's arm. Fact No. 31. Consequently, to the extent the use of the PepperBall system caused Mr. Duran's death, which it did not (see below), it was not due to any defect, but rather to the misuse of the system. BCSO officers were warned in no uncertain terms not to use glass-breaking rounds on human targets, yet they did so. Facts Nos. 15, 26. Their misuse of the system is not a design defect, and there is no liability for failure to warn when a clear warning was demonstrably not heeded. See Mims, 2017 WL 3405559, at *4 (noting to show causation on failure to warn claim, a plaintiff must show an adequate warning would have been "noticed and acted upon").

More broadly, during the incident with Mr. Duran, Mr. Duran wielded a knife and was yelling, something to the effect of "kill me." Fact No. 21. A psychiatrist later found Mr. Duran to be disoriented, severely agitated, and showing signs of delirium. Fact No. 22. BCSO ruled out various methods of subduing Mr. Duran, including use of a Taser, pepper spray, and beanbags, before ultimately settling on the PepperBall system and a muzzled canine. Facts Nos. 23–24. When the PepperBall system failed to subdue Mr. Duran, a canine was deployed, and the canine

knocked Mr. Duran to the ground, breaking his hip. Facts Nos. 27–29.

The medical evidence in this case shows Mr. Duran suffered from emphysema and arteriosclerosis at the time of the incident. Fact No. 30. While in the hospital, because of his emphysema and recurring pneumonia, Mr. Duran suffered respiratory failure requiring a ventilator and tracheostomy. Facts Nos. 33–34. The recurrent pneumonia resulted from Mr. Duran's debility as a result of his hip fracture, his altered mental status leading to recurrent aspiration, and the tracheostomy tube requiring ventilator support. Fact No. 35. Mr. Duran's condition worsened until his pneumonia caused hypoxia, which likely led to the cardiac arrest that ultimately killed him. Fact No. 32. Mr. Duran was hospitalized for approximately one month before he died. See Facts Nos. 30, 34. During that time, however, Mr. Duran's wounds from the projectiles were superficial and healing, and there is no medical evidence to suggest these superficial and healing wounds contributed to Mr. Duran's the pneumonia and respiratory failure that appear to have ultimately caused his death. Facts Nos. 36–38.

Plaintiffs cannot establish causation on their strict products liability claims because they cannot show the PepperBall system was "reasonably connected as a significant link" to Mr. Duran's death. Mims, 2017 WL 3405559, at *4 (emphasis added). Mr. Duran was suffering from mental illness and was involved in a situation in which he posed a substantial risk of harm to himself and others. Because of numerous circumstances, BCSO believed it had limited options to resolve the situation while minimizing the risks of harm to Mr. Duran. Facts Nos. 23–24. Among those options was the PepperBall system, but when it was deployed, it had no impact on Mr. Duran. Facts Nos. 23, 27. BCSO then deployed the canine, which led to Mr. Duran breaking his hip. Facts Nos. 28–29.

Up until that point, the PepperBall system factored only minimally in the events which

ultimately led to Mr. Duran's death. It never became more significant. The projectiles left

lacerations and superficial wounds, but those wounds bore no relationship to Mr. Duran's

already-impaired lungs and the pneumonia resulting from his broken hip. <u>See</u> Facts Nos. 36–38.

The undisputed medical evidence showed Mr. Duran died because of his respiratory failures, not

his superficial projectile wounds, which were healing when he died. Facts Nos. 36–38. One can

trace a clear line of causation from Mr. Duran's broken hip to his death. The PepperBall system

falls nowhere on that line. There is no dispute of material fact as to causation. Plaintiffs cannot

show causation, and their strict products liability claims therefore fail as a matter of law.

## II.        Plaintiffs' Negligence Claim Fails as a Matter of Law.

The essence of Plaintiffs' negligence claim is ATO and PCP did not use ordinary care in

warning and instructing its users regarding the PepperBall system and in designing, engineering,

producing, testing, assembling and packaging the system. Am. Compl. ¶¶ 104–105. Plaintiffs

also allege ATO and PCP breached their duty of care by distributing the PepperBall system to

BCSO. <u>Id.</u> ¶ 108.

In order to prevail on their negligence claim, Plaintiffs are required to establish: (1) the

existence of a duty owed to plaintiff, (2) a breach of such duty, (3) a causal connection between

defendant's conduct and the injury to plaintiff, and (4) damages resulting from such conduct.

<u>Therm-O-Disc, Inc</u>., 476 F. Supp. 2d at 1224. The same definition of causation applies to

products liability claims based on negligence and strict liability. <u>Id.</u> at 1225. Thus, to succeed on

their negligence claim, Plaintiffs must show the negligent acts of ATO and PCP contributed to

bringing about Mr. Duran's death, and his death would not have occurred without those acts.

<u>Mims</u>, 2017 WL 3405559, at *4. The negligent acts of ATO and PCP must be significantly

linked to Mr. Duran's death. <u>Id.</u>

The causation argument presented in the preceding section of this brief is applicable to Plaintiffs' negligence claim. It does not bear repeating in full and, instead, is incorporated here by reference. However, the claims are conceptually distinct in at least one regard—rather than focusing on how the product (i.e., the PepperBall system) caused Mr. Duran's death, the inquiry as to Plaintiffs' negligence claim focuses on the consequences of the alleged failures of ATO and PCP to exercise ordinary care. Still, the change in inquiry does alter the undisputed facts showing Mr. Duran's death was predominately set about by events and circumstances wholly unrelated to any decision ATO and PCP could have made with respect to the PepperBall system. The PepperBall system had nothing to do with Mr. Duran's mental state and actions on September 15, 2015, which caused the BCSO to arrive on the scene. Once Mr. Duran's hip was broken, nothing about the PepperBall system or its use had any bearing on Mr. Duran's sharply escalating respiratory problems.

Although there is a thin sliver of time—after BCSO arrived on the scene and before officers deployed the canine—in which different decisions or circumstances may have led to a different outcome, causation is not an invitation to engage in fantasy. Causation entails an analysis of relationships between what <u>did</u> occur or errors that <u>were</u> made, and the eventual outcome. <u>See</u> <u>Mims</u> 2017 WL 3405559, at *4. Thus, the causation element as to Plaintiffs' negligence claim must always be framed by Mr. Duran's behavior on the one end, and his fatal respiratory failures on the other. There is no evidence to which Plaintiffs can point which will fill that thin sliver and show a significant relationship between the negligence of ATO and PCP, and Mr. Duran's death.

Accordingly, because Plaintiffs cannot establish causation as to their negligence claim, the Court should grant summary judgment to ATO and PCP on that claim.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Advanced Tactical Ordnance Systems, LLC and Perfect Circle Projectiles, LLC respectfully request that the Court grant summary judgment in favor of Advanced Tactical Ordnance Systems, LLC and Perfect Circle Projectiles, LLC as to each of Plaintiff Sally Duran and Robert Duran's claims, for an award of Advanced Tactical Ordnance Systems, LLC and Perfect Circle Projectiles, LLC attorneys' fees and costs, and to grant all such other and further relief as the Court deems just and proper.

Dated: October 29, 2020

Respectfully submitted,

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By _/s/ Eric R. Burris_
    Eric R. Burris
    201 Third Street NW, Suite 1800
    Albuquerque, NM 87102
    Telephone: (505) 244-0770
    Facsimile: (505) 244-9266
    Email: eburris@bhfs.com;

*Attorneys for Advanced Tactical Ordnance Systems, LLC and Perfect Circle Projectiles, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 29, 2020, I filed the foregoing electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

By _/s/ Eric R. Burris_
    Eric R. Burris

21360399.9