## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

No. 1:18-cv-01062MV/LF

CELESTINA "SALLY" DURAN,
Individually and as Personal
Representative of the ESTATE OF
FIDENCIO DURAN; and ROBERT
DURAN,

    Plaintiffs,

vs.

UNITED TACTICAL SYSTEMS, LLC
D/b/a PEPPERBALL; ADVANCED
TACTICAL ORDINANCE SYSTEMS,
LLC d/b/a PEPPERBALL; TIPPMANN
SPORTS, LLC; and PERFECT CIRCLE
PROJECTILES, LLC,

    Defendants.

ZOOM DEPOSITION OF CRAIG SEVIER
April 7, 2020
1:20 p.m.
DIXON*SCHOLL*CARRILLO, PA
6700 Jefferson Street, NE, Bldg. B, Suite 1
Albuquerque, New Mexico 87110

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE THIS DEPOSITION WAS:

TAKEN BY:  MR. JAMES C. WILKEY
            ATTORNEY FOR THE DEFENDANT TIPPMANN SPORTS, LLC

REPORTED BY: Penny E. McAlister, CCR, NM CCR #250

## Page 46

1  Q. How about a wait -- a wait-and-see approach? Was
2  there a time when you could have just said, you know, we
3  don't have to do anything right now. Let's just -- let's
4  give him another two, three hours, maybe all day?
5  A. There was -- there was that option. Again, I
6  believe that in the discussion that I had with Captain
7  Dunlap, a time of 10:00 o'clock had been set. I don't have
8  a particular reason for that particular time.
9  Q. So what options were discussed before the plan to
10 do the PepperBall in conjunction with the muzzled canine?
11 What -- what other options were discussed? Go ahead.
12 A. I'm sorry, I didn't mean to interrupt your
13 question.
14 Q. No. It's fine. Go ahead.
15 A. Our discussion had kind of gone through the gamut
16 of what tools were available to us, and in consideration of
17 the particulars of that incident with Mr. Duran's age, we
18 tried to come up with the -- the tools that we believed
19 would do the least amount of harm.
20 Q. Let's walk through the tools (inaudible.) Was
21 Taser discussed as an option?
22 A. Yes, it was, but there is specific mention in the
23 training, and I also believe in -- in our Standard
24 Operating Procedures, that -- that using that, certainly,
25 it was not an option.

## Page 47

1  Q. I take it that's because of Mr. Duran's age and
2  exposure to electricity?
3  A. Correct.
4  Q. The Taser option was discussed and ruled out.
5  How about mace, pepper spray?
6  A. Again, that's one of the options that was
7  discussed, as well as the concern about the proximity that
8  you would have to put yourself in to Mr. Duran in order to
9  safely deploy those things, and was also a component of the
10 PepperBall launcher.
11 Q. The proximity meaning an officer, for the jury's
12 benefit, would have to get close to him in order to deploy
13 the spray, which would put that officer in striking
14 distance of Mr. Duran's knife.
15 A. That potentially existed, yes.
16 Q. Was there any other consideration with respect to
17 the mace that ruled out that option?
18 A. In regards to the -- the fogger that was
19 available, just the amount of aerosol that it would put out
20 and the effect that it would probably have on not just
21 Mr. Duran, but all of the deputies in the area, as well.
22     THE REPORTER: I'm sorry, I didn't hear that
23 question.
24 Q. Let me rephrase it. So you're -- you're saying
25 that the area was too open; and therefore, if the

## Page 48

1  dispersion was too great, that could affect officers at the
2  scene, as well as Mr. Duran?
3  A. Correct.
4  Q. Any other considerations with respect to that
5  tool?
6  A. Not that I recall offhand.
7  Q. How about the beanbag, is that an option?
8  A. We ruled that out as an option based on
9  Mr. Duran's age.
10 Q. And why was it made a consideration with it?
11 A. Well, I mean, he's 88 years old, and just based
12 on common knowledge of folks that are 88 years old, with
13 brittle bones and things like that, the beanbag being
14 compared to a 90-mile-an-hour fastball, we were more
15 concerned about bones being broken.
16 Q. So the beanbag is going to have a pretty
17 significant risk of severe injury on a person of
18 Mr. Duran's age. Fair to say?
19 A. Yes. And I believe that the directions that were
20 given out to people was -- because somebody was equipped
21 with a beanbag, that that would be absolutely the last
22 option if it -- if it came to that.
23 Q. So in the spectrum of use-of-force options that
24 lead all the way up to lethal force itself, a beanbag is
25 just below that taking-your-firearm-and-shooting-someone



Page 49

1  option; is that right?
2      A.  Correct.
3      Q.  How about -- well, any other considerations in
4  ruling out the beanbag?
5      A.  Not that I can recall offhand.
6      Q.  Expandable baton?
7      A.  The proximity that you would have to get to
8  Mr. Duran in order to deploy it.
9      Q.  And that's the same -- it's the same issue with
10 the mace, pepper spray; correct?
11     A.  Correct.
12     Q.  Any other issues with the baton in particular?
13     A.  Again, Mr. Duran's age and striking him with a
14 baton would be a higher probability of causing broken
15 bones.
16     Q.  All right.  And then you've got communicating and
17 waiting -- waiting and seeing what happens is the final
18 option you mentioned to me.  Is it fair to loop those into
19 one -- one sort of option, continued communication and
20 wait?
21     A.  Yes.  And I know some of the concerns that I had
22 about simply waiting -- I mean, we're talking about a
23 September day.  This is early morning.  So the temperature
24 wasn't a concern at that particular point in time, but the
25 temperature was rising.

Page 50

1  Mr. Duran didn't have a shirt on or a hat or
2  anything that would protect him from the sun, and there was
3  some concern about -- if I recall correctly, we had also
4  been informed that Mr. Duran was supposed to be taking
5  medication that he hadn't taken over the last two days.
6         So we weren't sure what type of medical
7  conditions could be affected by simply waiting, whether
8  those would get worse or if those would cause problems, as
9  well, as well as having an 88-year-old human being exposed
10 to the New Mexico sun in mid-September for an extended
11 period of time.
12        I can't speak for everybody individually, but I
13 know that if you have me sitting out in the sun all day, I
14 would probably get second degree sunburns from the New
15 Mexico sun.
16     Q.  So in terms of the -- you communicating and
17 wait-and-see option, you get concerns about the day heating
18 up, exposure to the sun.  He's got no shirt, no hat.  He
19 may or may not be on medications that could lead to a
20 worsening condition, and then, generally, his age.
21     A.  Yes.
22     Q.  Anything else?
23     A.  Not that I can think of offhand.
24     Q.  All right.  So the plan was then made to deploy
25 the Pepperball System, and then as I understand it, the

Page 51

1  backup part of that plan was then deployment of the muzzled
2  canine; is that right?
3      A.  Yes.
4      Q.  Let me see if I can show you a document here.
5  It's actually been marked up by one of your fellow
6  deputies.  So I'll just -- I want to walk you through the
7  positions that various folks were in to see if you can
8  elaborate on where folks were positioned.  All right.  Do
9  you see that on your screen there?
10     A.  Yes.
11     Q.  So this was Officer Velarde that gave us his
12 various positions throughout the day.  He -- he basically
13 would move from here all the way up to here.  Does that
14 comport with your understanding of his position?
15     A.  I'm not going to tell you that I tracked each and
16 every person's individual position.  I remember Velarde
17 being on -- what I believe this would be the north side of
18 that scene, but as far as him moving back and forth, I
19 don't recall that.
20     Q.  And then here in the middle, the circle here is
21 where Officer Velarde had indicated Mr. Duran was.  Officer
22 Velarde told us that he would pace back and forth from
23 about here to here throughout the day, but other than that,
24 he remained basically in the same position.
25     A.  To the best of my recollection, I did not keep an

Page 52

1  eye on Mr. Duran the entire time.
2      Q.  And then over here was what Officer Velarde
3  described as an unknown area to the backyard, which raised
4  concerns for him, I'll represent to you, because he wasn't
5  sure what they were looking at back there in terms of what
6  Mr. Duran had access to.  Was that a concern for you, as
7  well?
8      A.  I wasn't really aware of that area.  It's not
9  something that I saw.  I don't recall seeing that area.
10     Q.  And then over here is a house that Officer
11 Velarde, I'll represent to you, had told us that these were
12 the folks that had called in the incident, and they were, I
13 guess, placed under a shelter-in-place order?
14     A.  Yes.
15     Q.  What concerns, if any, did you have regarding
16 them?
17     A.  They were -- they were in their home.  Should
18 anything escalate to the discharge of firearms, we would be
19 concerned about -- about those types of -- about those
20 rounds going through walls and potentially striking
21 occupants, especially if they would happen to be in that
22 line of fire, or the discharge of firearms.
23        If I recall correctly, they were asked to go to
24 the -- what would have been the southwest corner of their
25 home, as far as back as they could go, which would be

