**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CELESTINA SALLY DURAN, Individually
and as Personal Representative of the
Estate of Fidencio Duran;
and ROBERT DURAN;

      Plaintiffs,

v.                                                                    Civ. No. 1:18-cv-01062 MIS/LF

UNITED TACTICAL SYSTEMS,
LLC d/b/a PEPPERBALL; ADVANCED
TACTICAL ORDNANCE SYSTEMS, LLC
d/b/a PEPPERBALL; and PERFECT
CIRCLE PROJECTILES, LLC;

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Defendant United Tactical Systems, LLC's

("UTS's") Motion for Summary Judgment. ECF No. 120. Plaintiffs filed their Response,

and Defendant UTS filed its Reply. ECF Nos. 134, 151. Having considered the parties'

submissions, the record, and the relevant law, the Court will deny the Motion.

## PROCEDURAL BACKGROUND

This is a case brought against Defendant UTS and others for strict products liability

(failure to warn and defective design) (Count I) and negligence (Count II). Plaintiffs allege

that UTS is liable for the death of their father, decedent Fidencio Duran ("Mr. Duran"),

who passed away after a September 15, 2015 incident between Bernalillo County

Sheriff's Office ("BCSO") deputies and Mr. Duran involving the use of a "PepperBall"-branded system. Defendants dispute many of Plaintiffs' allegations.[1]

On September 14, 2018, Plaintiffs filed the present lawsuit against Defendants in the Second Judicial District Court, County of Bernalillo, State of New Mexico. *See generally* ECF No. 1-1. Defendants removed the case to this Court on the basis of diversity jurisdiction. *See* ECF Nos. 1, 7.[2]

The present Motion (ECF No. 120) seeks summary judgment on all of Plaintiffs' claims against Defendant UTS. Essentially, Defendant UTS argues that under New Mexico law, it is not responsible for the debts and liabilities of any other company (including Perfect Circle Projectiles, LLC ("PCP") and Advanced Tactical Ordnance Systems, LLC ("ATO")), based on New Mexico's general rule of non-liability; that no exception to the general rule of non-liability applies (including New Mexico's product line exception); and that, therefore, all claims against UTS must fail as a matter of law.[3] Plaintiffs argue that the product line exception does indeed apply to the undisputed facts of the case, and separately, that UTS may be liable for breaching a post-sale duty to warn of foreseeable defects in the PepperBall system. The Court will address each of Defendant UTS's relevant arguments, and Plaintiffs' relevant responses thereto, in turn.

---

[1] The substantive allegations of Plaintiffs' Complaint, regarding the facts surrounding the actual incident and alleged harm suffered by the decedent, Mr. Duran, are not at issue in the pending Motion for Summary Judgment, unless otherwise specifically noted herein.

[2] All claims against Defendant Tippmann Sports, LLC were dismissed by stipulation, pursuant to Federal Rule of Civil Procedure 41(a). *See* ECF No. 109.

[3] UTS's Motion focuses on "the general rule of non-liability," its four traditional exceptions, and the product line exception. *See* ECF No. 120. The Motion does not appear to address the issue of strict liability versus negligence, nor does it appear to address the issue of Defendant UTS's duty to warn (or lack thereof). Therefore, the Court will not address these issues, which have not been presented in the Motion.

## FACTUAL BACKGROUND

The facts stated below are either undisputed or stated in the light most favorable to the nonmovant, for purposes of the present Motion: [4] [5] [6]

On September 15, 2015, numerous BCSO deputies responded to a call from a woman concerned about a man, Fidencio Duran, who appeared distressed and was carrying a knife. ECF No. 120, UMF 3. The BCSO deputies ordered that Mr. Duran drop the knife, but he did not comply with the deputies' commands. *Id.*, UMF 4. The deputies eventually deployed numerous projectiles against Mr. Duran to attempt to gain compliance from him. *Id.*, UMF 5. This included projectiles deployed from "PepperBall"-

---

[4] For purposes of the Motion for Summary Judgment, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See* Standard for Summary Judgment below.

[5] In response to several items contained in Plaintiffs' Additional Facts (ECF No. 134 at 3–11), Defendant UTS makes an argument that certain documents "ha[ve] not been made a part of the record" and are therefore "not adequate support" for the proposition cited. ECF No. 151 at 3, 8 (Defendant UTS's Response to Plaintiffs' Add'l Facts A, Y, Z) (citing Fed. R. Civ. P. 56(c)(1)(A)). However, Defendant UTS fails to explain how these documents are not a part of the record for purposes of Federal Rule of Civil Procedure 56(c)(1)(A). Given that Defendant UTS has failed to make a sufficient showing of how or why these materials "ha[ve] not been made a part of the record," the Court will not consider this undeveloped argument. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) ("We will consider and discuss only those of her contentions that have been adequately briefed for our review.")).

[6] In their Response, Plaintiffs state:

"In the late 1990s, PepperBall Technologies, Inc. ("PTI"), which at the time was known as Jaycor Tactical Systems, Inc., filed an application to patent a projectile system that could deliver an inhibiting substance to living targets. Jaycor subsequently changed its name to PTI . . . . The inventors envisioned that their projectiles could be filled with a substance such as oleoresin capsicum and successfully launched using commercially available paintball equipment."

ECF No. 134, UMF A; *id.* n.1. UTS claims to dispute Plaintiffs' UMF (without sufficient factual explanation for the basis of its dispute). *See* ECF No. 151 at 3. To further complicate matters, the documents attached to Plaintiffs' Response do not appear to support some or all of the above contentions, insofar as these contentions relate to PTI as a successor to Jaycor. *See, e.g.*, ECF No. 134-5 (not containing the pages cited by Plaintiffs). Therefore, the facts presented by Plaintiffs would be inadmissible as evidence, based on the record made available to the Court by the parties. The Court ultimately determines that this issue is immaterial but has provided the above information for reference.

branded launchers.[7] Plaintiffs allege that that Mr. Duran was unduly harmed by the use of the PepperBall system against him, resulting in his hospitalization and eventual death, and that Defendants are therefore liable under theories of strict products liability and negligence. *See* ECF No. 134 at 1.[8]

The projectiles that BCSO deployed against Mr. Duran were deployed from launchers known as PepperBall SA200 launchers. *Id.*, UMF 7; *see also* ECF No. 134, UMF B. The SA200 launcher has the PepperBall brand name on its side. *See* ECF No. 134, UMF C. The SA200 is just one component within the PepperBall system. *See id.*, UMF D. The system includes the launcher, a compressed air system, projectiles, chemical agent, an owner's manual with warnings, and training. *Id.* When UTS refers to the "PepperBall [s]ystem," it specifically means the "launcher, projectiles, and training." *Id.* The SA200 was one of multiple PepperBall launchers that were sold as part of the PepperBall system. *Id.*, UMF E. UTS describes its product as the "PepperBall [s]ystem," regardless of what kind of launcher is being used to fire the proprietary projectiles. *Id.*

The projectiles that BCSO deployed against Mr. Duran were deployed from launchers that were not sold to BCSO by UTS.[9] ECF No. 120, UMF 6. In fact, UTS has

---

[7] Although Defendant UTS refrained from using the term "PepperBall" in the facts section of the Motion, the Court notes Defendant's apparent admission on the first page of the Motion that the "launcher at issue" is a "Pepperball" launcher. *See* ECF No. 120 at 1 ("Specifically, UTS did not design, manufacture, market, sell, or provide training related to the Pepperball launcher at issue."). Plaintiffs similarly refer to the SA200 as a "Pepperball" launcher. *See* ECF No. 134, UMF B. Therefore, the Court determines that there is no genuine dispute that the launcher at issue is called a "PepperBall" launcher.

[8] Although Plaintiffs did not cite to specific admissible evidence regarding Mr. Duran's cause of death in the present Motion, the Court notes that the record does contain this information. *See, e.g.*, ECF No. 141-8 at 2 (medical investigator findings regarding cause of death, including "wounds of the arms from the pepper gun" as contributing factors).

[9] The record available to the Court suggests that at least some of the PepperBall launchers used by BCSO were sold to it by predecessor company Pepperball Technologies, Inc. *See* ECF No. 134, UMF H.

never sold an SA200 launcher. *Id.*, UMF 12. UTS did not manufacture the projectiles that were sold to BCSO and deployed against Mr. Duran by BCSO. *Id.*, UMF 8. UTS did not design the SA200 launcher. *Id.*, UMF 9. UTS did not manufacture the SA200 launchers that were sold to BCSO. *Id.* Rather, Tippmann Sports, LLC manufactured the SA200 launchers that were sold to BCSO. *Id.* UTS did not market the launchers that were sold to BCSO. *Id.*, UMF 10. Manufacturing of the SA200 launcher was discontinued in 2006, but UTS's predecessors (including ATO) continued to sell refurbished versions of the SA200 launcher as part of the PepperBall system until 2014. *See id.*, UMF 11; *see also* ECF No. 134, UMF Z. BCSO ordered several refurbished SA200 launchers from ATO in 2012. *See id.*[10]

ATO was formed in late-2011 by two suppliers of a prior company, PepperBall Technologies, Inc. ("PTI"), which held assets constituting the PepperBall system. *See* ECF No. 134, UMFs I–W. Specifically, in December 2011, PCP and Tactical Air Games ("TAG"), formed ATO (previously called Phoenix International, LLC) to "foreclose on certain loans held by PTI's creditors," with the ultimate goal to acquire PTI's assets. *See id.*, UMF I; *see also* ECF No. 134-5 at 9.[11] On January 9, 2012, the parties conducted a UCC sale. *Id.*, UMF J. PTI ceased its operations on the day of the sale. *Id.*, UMF K. In the

---

[10] The parties claim to dispute whether PTI or ATO sold these products to BCSO, given that the BCSO purchase orders (ECF No. 134-6) refer to "PepperBall Technologies Inc."; however, it is undisputed that only one of these entities was in existence at the time of these transactions in 2012, based on the fact that all of PTI's assets were acquired by ATO on January 9, 2012, and PTI ceased its operations on the same day. *See* ECF No. 134, UMFs J, K, L. Therefore, sufficient evidence shows? that ATO sold these items to BCSO.

[11] UTS claims to dispute Plaintiffs' UMF I, but the Court finds that, viewed in the light most favorable to Plaintiffs, the statements made by Plaintiffs in UMF I are supported by sufficient admissible evidence in the record, and therefore must be assumed true for purposes of the Motion.

sale, ATO acquired all of PTI's tangible and intangible property, including intellectual property, trade secrets, physical assets, equipment, existing inventory, inventions, patents, and trademarks. *Id.*, UMF L.[12] ATO acquired PTI's projectile molds, computer systems, sales history, irritant powder formulas, outstanding purchase orders, customer lists, and outstanding invoices. *Id.*, UMF M. ATO also acquired documentation of PTI's sales and PTI's training. *Id.*, UMF N. PTI's weapons manuals were not excluded from the acquisition. *Id.* PTI transitioned to ATO and made sure that PTI's customers "received what they needed and got what they wanted." *Id.*, UMF O. At the time of the acquisition, ATO kept a majority of PTI's employees; it kept all of the same salespeople, and it used the same training subcontractors. *Id.*, UMF P. One managerial employee testified that her job duties did not change in the transition from PTI to ATO. *See id.* ATO was responsible for the sale of the PepperBall system. *Id.*, UMF Q. ATO was responsible for training agencies to use the PepperBall system, and it kept PTI's existing government contracts. *Id.*, UMFs R, V. ATO operated under the name PepperBall Technologies and retained PTI's phone number and website. *Id.*, UMFs T, U. ATO honored PTI's warranties, including warranties and repairs of the SA200 launcher.[13] *Id.*, UMF W. There was no discernible shift in the approach to sales or training on the PepperBall system following the transition to ATO. *Id.*, UMF S.

---

[12] Although Plaintiffs state in UMF L that ATO acquired "SA200 launchers" specifically, UTS is correct that this is not supported by sufficient admissible evidence by Plaintiffs. *See* ECF No. 134-5 at 11 (witness testimony that SA200 launcher system units would have been acquired "*if* they were physically in inventory" (emphasis added)). The witness did not state that the SA200 launcher system units were in inventory. *See generally id.* Ultimately, this issue is immaterial, and even if somehow material, the contract terms speak for themselves.

[13] With regard to the specific type of SA200 launcher at issue, predecessor PTI would repair and service SA200 components at its San Diego warehouse. *See* ECF No. 134, UMF G.

6

In summer 2014, a newly formed company, Defendant UTS, purchased the assets of ATO and PCP in an assets-only acquisition (the "Asset Purchase Agreement"). *Id.*, UMF 13; ECF No. 134, UMF BB. UTS was formed to purchase the assets of ATO, PCP, and TAG. ECF No. 134, UMF BB. The selling parties in the Asset Purchase Agreement included ATO and PCP. ECF No. 120, UMF 14. UTS was the purchaser in the Asset Purchase Agreement. *Id.* UTS agreed to purchase various acquired assets in the Asset Purchase Agreement, including, but not limited to, inventory, office supplies, vehicles, and bank accounts. *Id.*, UMF 15. UTS acquired all of the assets and properties that ATO, PCP, and TAG used in, or that were related to, the operation of their respective businesses, except for assets expressly specified in the Asset Purchase Agreement. ECF No. 134, UMF CC. This included all interests in the assets, properties, rights, titles and interests of every kind and nature owned by ATO and PCP. *Id.*, UMF DD. With the exception of certain explicitly excluded assets, UTS acquired all of ATO and PCP's inventory, intellectual property, proprietary rights, research and development materials, "know-how," formulas, processes, inventions, designs, trade secrets, customer lists, employment records, marketing materials, permits, licenses, certifications, bank accounts, goodwill, and other items. *See id.*, UMF GG. With the exception of certain specifically excluded assets and required third party consents, UTS acquired ATO and PCP's contracts. *See id.*, Ex. HH; *see also* ECF No. 120-4 at 11 (Excluded Assets), 13 (Third Party Consents); ECF No. 134-7 at 1 (Schedule of Excluded Assets). UTS acquired ATO's business name and has the right to operate with the name "Advanced Tactical Ordnance." ECF No. 134, UMF II. UTS acquired the equipment at PCP's factory in Lake Forest, Illinois, where it still manufactures projectiles for the PepperBall system. UMF JJ.

UTS acquired ATO's irritant powder formula, which ATO had previously acquired from PTI. *See id.*, UMF KK. UTS uses fundamentally the same process ATO (and PCP) used to manufacture the shells for the PepperBall projectiles, although the process may have been refined. *See* ECF No. 134, UMF LL; ECF No. 134-5 at 3.

UTS carries the same business as ATO and serves the same customers. ECF No. 134, UMF SS. UTS is currently selling projectiles, launchers, and safety training under the PepperBall brand name to law enforcement and the military. ECF No. 134, UMF RR. UTS, like ATI and PTO before it, has done business with BCSO. *Id.*, UMF UU. UTS did not provide any training to BCSO between the date of the July 2014 Asset Purchase Agreement and the date of the September 2015 incident involving Mr. Duran. ECF No. 120, UMF 19. However, UTS did provide training to BCSO in 2016, after the incident involving Mr. Duran.[14] *See id.* BCSO deputies attended UTS's PepperBall instructor courses in 2016 and 2017. *See* ECF No. 134, UMFs BB, CC, VV. If a BCSO deputy has a question about the safety or use of the SA200 launcher, he or she can call UTS for help. *See id.*, UMF WW. After coming into existence in 2014, UTS continued to accept service calls for repairs of the PepperBall SA200 launcher, although the lead technician can no longer find parts for that specific product. *See* ECF No. 120, UMF 13; ECF No. 134, UMFs BB, MM.

Most ATO employees became UTS employees at the time of the acquisition. ECF No. 134, UMF NN. One managerial employee, UTS's Director of Training and Sales, has

---

[14] Interestingly, the passage cited by UTS in its Motion shows that the same UTS employee that testified regarding UTS training in 2016 also had knowledge that predecessor ATO provided training to BCSO in November 2012. *See* ECF No. 120-3 at 5. The witness also admitted that as an employee of UTS, she still had a record in her possession regarding the 2012 training, even though the training was provided by predecessor ATO. *Id.* at 6.

been an employee of all three companies (PTI, ATO, and UTS), and, "[f]or the past 20 years, [has] been with PepperBall under different names." ECF No. 134, UMF OO. The majority of ATO's training instructors are still with UTS. *Id.*, Ex. PP. Similarly, another managerial employee, UTS's Sales and Training Manager, testified that she still works in the same San Diego sales office where she worked while she was an employee of ATO, and her duties did not change when she moved from ATO to UTS. *See* ECF No. 134, UMF PP; *see also* ECF No. 134-3 at 4.

A list of seven excluded categories of assets was set out in a separate Schedule attached to the Asset Purchase Agreement. *Id.*, UMF EE; *see also* ECF No. 151 at 9; ECF No. 134-7 at 1. The SA200, and all of ATO's rights and interests in the SA200, are not specifically listed as exclusions in the Asset Purchase Agreement. ECF No. 134, UMF FF. However, as previously stated, production of the SA200 launcher had been discontinued beginning in 2006, sales of refurbished models had been discontinued in 2014, and that specific model was no longer being manufactured or sold at the time of the Asset Purchase Agreement in 2014. *See* ECF No. 120, UMFs 11, 12, 16, 18.[15] The PepperBall SA200 launchers deployed against Mr. Duran by BCSO deputies were purchased by BCSO before UTO purchased ATO's assets. ECF No. 120, UMF 17.

Although it did acquire all of the assets and properties that ATO, PCP, and TAG used in its respective business, *see* ECF No. 134, UMF CC, UTS expressly did not assume all of the liabilities of the selling parties to the Asset Purchase Agreement. ECF

---

[15] Although Plaintiffs generally dispute UMF 16, they have presented no supporting information to challenge UTS's assertion that the SA200 was no longer being manufactured after 2006. *See generally* ECF No. 134, at 3, 6-7. Therefore, the Court will consider UMF 16 to be undisputed.

No. 120, UMF 20. UTS assumed only the following: limited financial liabilities; health, dental, and life insurance policies; and certain contractual obligations. *Id.*, UMF 20. Section 1.3 of the Asset Purchase Agreement contains a list of "Excluded Liabilities"— liabilities that UTS expressly did not assume in the Asset Purchase Agreement. *Id.*, UMF 21. For instance, Section 1.3 of the Asset Purchase Agreement provides, in relevant part:

> Except as expressly provided in Section 1.2, purchaser will not assume or be liable for any Liabilities of any Asset Seller or any other Person (including any Asset Seller Owner), whether or not relating to the business or the Acquired Assets or whether or not disclosed on the Schedules attached hereto, and regardless of when or by whom asserted.

*Id.*, UMF 21. The Excluded Liabilities in the Asset Purchase Agreement reference "any Liability of any Asset Seller which Purchaser may become liable for as a result of or in connection with any 'de facto merger' or 'successor in interest' theories of liability (other than the Assumed Liabilities)." *Id.*, UMF 22. The Excluded Liabilities in the Asset Purchase Agreement also reference "any Liability in connection with any Proceeding commenced or relating in any way to activities or operations of the Business prior to the Closing Date, including all Proceedings described in Schedule 3.11." *Id.*, UMF 23.

Both ATO and PCP have ceased operations, but as of April 16, 2020, they had not officially dissolved, only because there was an escrow holdback that still had to be reported on outstanding tax returns. *See* ECF No. 134, UMF XX.[16] [17]

---

[16] UTS rightly points out several inaccuracies in Plaintiffs' original UMF XX. The Court has rephrased UMF XX to conform to the evidence submitted. *See* ECF No. 134-5 at 17.

[17] In their Response (ECF No. 134 at 9–11), Plaintiffs state facts in an attempt to establish the "mere continuation" exception to non-liability; however, Plaintiffs already have admitted that the four traditional exceptions to non-liability "are inapplicable here." *See* ECF No. 134 at 12. Even if applicable,

**DISCUSSION**

**I.      Standard for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-252 (1986). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim.[18] *Id.* at 248.

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the nonmovant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to

---

these facts, standing alone, would be insufficient to meet the "mere continuation" standard. Compare *id.* with *Garcia v. Coe Mfg. Co.*, 933 P.2d 243, 247 (N.M. 1997) (requiring "(1) a continuity of directors, officers, and shareholders; (2) continued existence of only one corporation after sale of the assets; and (3) inadequate consideration for the sale of the assets"). With the possible exception of the second element, Plaintiffs have not presented sufficient evidence to meet this standard.

[18] Several of the facts presented by the parties are immaterial under the standard set forth in *Anderson*. *See* 477 U.S. at 249–50. The Court acknowledges that some of the facts, although immaterial, are helpful for the purpose of providing background and context of the case. If material, the Court will apply these facts, as necessary, in the Analysis section of this Memorandum Opinion and Order.

survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (internal quotation marks omitted).

It is not the Court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Rather, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–552 (1999); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) ("When applying th[e summary judgment] standard, [the court] view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party.") (internal quotation marks omitted). However, summary judgment may nevertheless be granted where "the evidence is merely colorable, or is not significantly probative." *Anderson*, 477 U.S. at 249–50.

## II.   Summary of Applicable Law

### A. General Rule of Non-Liability

New Mexico courts have traditionally held that "where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor." *See, e.g., Pankey v. Hot Springs Nat'l Bank*, 119 P.2d 636, 640 (N.M. 1941) (citations omitted). To this general rule there are four well recognized exceptions, under which the purchasing corporation becomes liable for the debts and liabilities of the selling corporation: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporations; (3) where the purchasing corporation is

12

merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts. *Id.* The parties agree that the four traditional exceptions to non-liability are inapplicable to the present case. *See* ECF No. 134 at 12. Therefore, the Court will not address these exceptions.

### B. Product Line Exception

Since its 1997 decision in *Garcia v. Coe Manufacturing Co.*, the New Mexico Supreme Court has recognized a fifth exception, the "product line" exception, which "seeks to establish whether there is a substantial continuity in the *products* resulting from the pretransaction and posttransaction use of the [predecessor's] assets." 933 P.2d 243, 247 (N.M. 1997) (citing 1 Timothy E. Travers *et al., American Law of Products Liability* § 7:20, at 37 (3d ed. 1994); *Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir. 1974); *Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873 (Mich. 1976)). The rationale underlying this exception is the necessity of protecting an injured person who may be left without a remedy if the predecessor has dissolved, is defunct, or is otherwise unavailable to respond in damages. *Id.* (citing *Turner*, 244 N.W.2d at 878). The New Mexico Supreme Court further stated,

> When a successor corporation continues to market many of the same products and represents to the public and its predecessor's customers that it is continuing the predecessor's enterprise, it essentially picks up where the predecessor left off. Whether liability should be imposed depends on whether the successor has the same ability as its predecessor to assess, control, and distribute the risks and costs of injuries caused by a product defect. If it does, we must still determine whether under the facts of a particular case this ability is nevertheless outweighed by the policies underlying the contract-law-based rule of successor corporation [non-liability]—chiefly, promoting the alienability of corporate assets.

13

*Id.* at 248 (citing *Cyr*, 501 F.2d at 1153; *Ray v. Alad Corp.*, 560 P.2d 3, 9-11 (Cal. 1977); Dale A. Stalf, Comment, *A Search for the Outer Limits to Successor Corporation Liability for Defective Products of Predecessors*, 51 U. Cin. L. Rev. 117, 126–30 (1982)).

### III.   Analysis

#### A.  Product Line Exception

Viewed in the light most favorable to the nonmovants (i.e., the Plaintiffs), there is a genuine dispute regarding whether the factual elements necessary to establish the product line exception exist; therefore, the Court is unable to grant summary judgment in favor of Defendant UTS.

In the present case, Defendant UTS has not shown that, as a matter of law, Plaintiffs are unable to meet the factual standards for the product line exception, as set forth in *Garcia*. To the contrary, the evidence submitted suggests that Plaintiffs are able to meet these standards. For instance, although the parties do not dispute that UTS never sold an SA200 launcher, UTS has failed to make a sufficient showing as to how the SA200 launcher is different from launchers later sold by PTI, ATS, and UTS as part of the "PepperBall" system, including showing that the SA200 launcher is, in fact, part of an entirely different "product line" in terms of the product line's "designs, equipment, and name." *See Garcia*, 933 P.2d at 250. At the very least, Plaintiffs have shown a genuine dispute of material fact as to whether UTS continued to produce and market the same

product line (i.e., the "PepperBall" system), in the same manner that it was produced and marketed by ATO and PTI.[19]

The Court believes that the goals of the product line exception would be served in this case, by protecting an injured person who may be left without a remedy if the predecessor has dissolved, is defunct, or is otherwise unavailable to respond in damages. *See Garcia*, 933 P.2d at 247. Although it is undisputed that the predecessor companies have not yet dissolved, Plaintiffs have set forth specific facts showing that ATO and PCP are nevertheless "defunct" or "otherwise unavailable to respond in damages." Specifically, Plaintiffs have presented sufficient admissible evidence that both ATO and PCP have ceased operations, and that they have not yet dissolved only because there was an escrow holdback that still had to be reported on outstanding tax returns. Therefore, the Court determines that Plaintiffs have set forth sufficient facts to show that ATO and PCP would not be able to respond in damages. In addition, given that it assumed the PepperBall product line, UTS has the same ability as its predecessor to assess, control, and distribute the risks and costs of injuries caused by a product defect. *See Garcia*, 933 P.2d at 247. Application of the product line exception would be entirely consistent with

---

[19] Even if the applicable "product line" consisted of only the PepperBall SA200 model (which Defendant UTS has not shown with sufficient undisputed facts), Plaintiffs have set forth sufficient facts to show that the SA200 was, in fact, included as an asset in the Asset Purchase Agreement. For instance, Plaintiffs have shown that ATO owned the SA200 product line in 2014, and that ATO sold all of its assets to UTS in 2014. *See* ECF 120-3, at 3 (ATO stopped selling refurbished SA200s in 2014); *see also* ECF No. 134-7, at 1 (SA200 was not an excluded asset); ECF No. 134, UMF GG (UTS acquired all of ATO's rights and interests in intellectual property and proprietary rights, know-how, formulas, processes, inventions, designs, trade secrets, and other listed property). Although the Asset Purchase agreement explicitly excluded any liabilities for "'de facto merger' or 'successor in interest' theories of liability (other than the Assumed Liabilities)" (ECF No. 120, UMF 22), as well as "any Liability in connection with any Proceeding commenced or relating in any way to activities or operations of the Business prior to the Closing Date, including all Proceedings described in Schedule 3.11," New Mexico's product line exception would still apply, given that (when viewed in the light most favorable to Plaintiffs) UTS assumed the SA200 product line (whether on its own or as part of the overall PepperBall system) as an asset in 2014. *See* ECF 134, UMFs FF, GG.

the goals outlined in *Garcia* and New Mexico law, given that the predecessor entities are defunct and (as of the date of the Motion) likely would already be dissolved, if not for the tax issues previously mentioned.

In its Reply (ECF No. 151 at 14–15), Defendant UTS argues that the District of New Mexico's prior decision in *Ramos v. Foam America, Inc.* is applicable to the facts of the present case. *See* Civ. No. 15-980 CG/KRS, 2018 WL 1684327 (D.N.M. Apr. 5, 2018). However, *Ramos* is distinguishable from the present case. Although *Ramos* involved some of the same arguments as those made in the present case, it had notably different facts. The *Ramos* plaintiffs argued that one or more successor companies continued a so-called "Reeves" tar-lugger product line, while the successor company defendants argued that the "Reeves" tar-lugger product line was not, in fact, the same product line linked to the alleged design defects. *See id.* at *4–5. The court in *Ramos* focused on the actual "product line" itself, finding that the post-acquisition product line involved a cylindrical tar-lugger (which was a completely different product line, called the Great Northern "Panther" line prior to the acquisition), whereas the pre-acquisition product line involved an octagonal tar-lugger (which was called the "Reeves" line but was discontinued prior to the acquisition). *Id.* Although plaintiffs argued that other factors applied, including whether the successor companies continued to service the pre-acquisition product line and marketed the new product line as "Reeves" products, ultimately the court focused on whether there was a genuine dispute of material fact regarding whether the Reeves *product line* itself remained the same, pre-acquisition and post-acquisition. *Id.* Applying New Mexico law to the undisputed facts, the court determined that the pre-acquisition and post-acquisition product lines were completely different, based on the "pillar principle of

16

the product line exception . . . that the successor entity must have continued the specific product line at issue." *Id.* at *5. Given that the post-acquisition *cylindrical* product line was actually a "Panther" product line in its design (although renamed "Reeves" after the acquisition), while the pre-acquisition *octagonal* Reeves product line was essentially discontinued, the product line exception did not apply under New Mexico law. *See id.* at *6.

Additionally, the court in *Ramos* found that the rationale underlying the product line exception would be violated, given that the pre-acquisition Reeves company continued to exist after the acquisition, under the name JAJ Equipment, Inc., and the court did not note any indication that the company was defunct. *See id.* Therefore, the court in *Ramos* found that defendants had shown that there was no genuine dispute that plaintiff had failed to establish the factual elements necessary for the product line exception, and it granted summary judgment in favor of defendants and against plaintiff on plaintiff's strict liability claim. *See id.* at *7.

The present case is distinguishable from *Ramos*. Here, there are insufficient facts to suggest that the design, equipment, or name of the PepperBall system changed between the date of UTS's acquisition of the PepperBall system and the date of Plaintiffs' alleged injuries, and the facts presented by Plaintiffs show that very little changed in the PepperBall system after UTS acquired it. In *Ramos*, however, the entire Reeves product line was essentially discontinued, while the Reeves *name* was transferred to the Panther product line, which had a different design. *Id.* at *5–6. In the present case, Defendant UTS has failed to show that the PepperBall system was discontinued or modified such that the SA200 constituted a different product line than that carried by UTS, and Plaintiffs

17

have set forth sufficient facts showing that the PepperBall system remained largely (if not entirely) the same, even though the specific SA200 model within the PepperBall product line was no longer being manufactured or sold.

In summary, Plaintiffs have presented facts showing that there is a genuine issue of material fact regarding whether the factual elements necessary to establish the product line exception are met. Therefore, summary judgment would be inappropriate in this instance. *See Anderson*, 477 U.S. at 250 (stating the nonmovant's burden in the context of a summary judgment motion).

### B. Post-Sale Duty to Warn

In its Motion, Defendant UTS asks for judgment in its favor as to all claims brought against it. *See* ECF No. 120 at 1–2. In their Response, Plaintiffs argue, "Whether or not UTS is subject to the product line exception to non-liablity, it still had a post-sale duty to warn of foreseeable defects in the PepperBall [s]ystem." ECF No. 134 at 18. The Court notes that Defendant UTS did not address the issue of post-sale duty to warn in its Motion, *see generally* ECF No. 120, but it did argue in its Reply that it "cannot be held liable for any of Plaintiff's claims stemming from the SA200," ECF No. 151 at 21. Regardless of the merits of either side's argument, UTS has failed to meet its burden of showing that it is entitled to judgment as a matter of law on the issue of post-sale duty to warn, given that it has failed to develop its argument in its Motion. *See* D.N.M.LR-Civ. 56.1(b) (moving party must file written memorandum containing a short, concise statement of the reasons in support of the motion with a list of authorities relied upon); *Abreu v. Berryhill*, Civ. No. 16-853 JCH/CG, 2017 WL 4286214, at *3 (D.N.M. Sept. 26, 2017) (courts may decline to consider arguments which are inadequately developed or presented superficially) (citing

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) ("We will consider and discuss only those . . . contentions that have been adequately briefed for our review.")). To the extent that UTS has made any arguments regarding Plaintiffs' claims of a post-sale duty to warn of foreseeable defects in the PepperBall system, UTS has failed to raise this argument sufficiently in the present Motion, and therefore the Court will not consider it. [20] [21]

## CONCLUSION

For the foregoing reasons, Defendant United Tactical Systems, LLC's Motion for Summary Judgment, ECF No. 120, is hereby **DENIED**.

**IT IS SO ORDERED.**

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE

---

[20] UTS disagrees with Plaintiffs' assertion that its arguments regarding failure to warn were not properly developed, and UTS generally states that "UTS moved for summary judgment because 'Plaintiffs cannot support any claim against UTS because UTS did not exist at the time relevant to the issues in this product liability claim. Specifically, UTS did not design, manufacture, market, sell, or provide training related to the Pepperball launcher at issue.'" *See* ECF No. 151 at 20–21 (quoting ECF No. 120 at 1). This general statement does not identify the claim or defense on which summary judgment is sought, pursuant to Fed. R. Civ. P. 56(a), nor does it cite to any legal authority. Furthermore, UTS concedes that "the failure to warn claim was not specifically addressed in the Motion," although it summarily claims that its position "has consistently been that it cannot be held liable for any of Plaintiffs' claims stemming from the SA200, which is the product at issue in this case." *See* ECF No. 151, at 21.

[21] Note that Defendant UTS claims to have "joined in ATO's and PCP's motion for summary judgment, which addresses Plaintiffs' failure to warn claims." ECF No. 151 at 21. The Court will address the merits of ATO and PCP's motion for summary judgment in a separate opinion, if appropriate.