## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CELESTINA SALLY DURAN, Individually
and as Personal Representative of the
Estate of Fidencio Duran;
and ROBERT DURAN,

      Plaintiffs,

v.                                                                  Civ. No. 1:18-cv-01062 MIS/LF

UNITED TACTICAL SYSTEMS,
LLC d/b/a PEPPERBALL; ADVANCED TACTICAL
ORDNANCE SYSTEMS, LLC d/b/a PEPPERBALL;
and PERFECT CIRCLE PROJECTILES, LLC,

      Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claims for Loss of Consortium. ECF No. 122. Plaintiffs filed their Response, and Defendants filed their Reply. ECF Nos. 133, 146. Having considered the parties' submissions, the record, and the relevant law, the Court will deny the Motion.

### PROCEDURAL BACKGROUND

This is a case brought against Defendants for strict products liability (failure to warn and defective design) (Count I) and negligence (Count II) regarding the manufacturing, marketing, and sale of the PepperBall system, which generally consists of semi-automatic, high-pressure air guns that use compressed air to propel ball-shaped projectiles containing chemical agents against human targets for law enforcement purposes. Plaintiffs allege that Defendants are liable for the death of their father, decedent Fidencio Duran ("Mr. Duran"), who passed away after a September 15, 2015 incident

between Bernalillo County Sheriff's Office ("BCSO") deputies and Mr. Duran involving the use of the PepperBall system. Defendants dispute many of Plaintiffs' allegations. On September 14, 2018, Plaintiffs filed the present lawsuit against Defendants in state court. *See generally* ECF No. 1-1. Defendants removed the case to this Court on the basis of diversity jurisdiction. *See* ECF Nos. 1, 7.[1]

The present Motion (ECF No. 122) seeks summary judgment on all loss of consortium claims brought by Plaintiffs Sally Duran ("Sally") and Robert Duran ("Robert") against all Defendants. Essentially, Defendants argue that under New Mexico law, neither Sally nor Robert has a valid loss of consortium claim (because they cannot meet the factual standard to establish their claims and, separately, because injury to the relationship between the father and each of his children was not foreseeable), and that, therefore, all loss of consortium claims against Defendants must fail as a matter of law. Plaintiffs Sally and Robert argue that there is a genuine dispute of material fact as to whether each of them shared a sufficiently close relationship with Mr. Duran to meet the factual standard for loss of consortium, and also that their injuries were foreseeable under New Mexico law. The Court will address each of Defendants' relevant arguments, and Plaintiffs' relevant responses thereto, in turn.

---

[1] All claims against Defendant Tippmann Sports, LLC were dismissed by stipulation, pursuant to Federal Rule of Civil Procedure 41(a). *See* ECF No. 109.

## FACTUAL BACKGROUND

The facts stated below are either undisputed or stated in the light most favorable to the nonmovant, for purposes of the present Motion:[2]

### A. Facts Regarding the September 15, 2015 Incident

Mr. Duran, an 88-year-old man, lost his wife of 67 years, Mabel ("Mrs. Duran"), on September 14, 2015. ECF No. 133-10 at 4; ECF No. 133-11 at 1; ECF No. 1-1, ¶ 61.[3] The couple had four children together, the youngest, Robert, being approximately 49 years old at the time of Mr. Duran's death. *See* ECF No. 133-11 at 1. Robert and his older sister, Sally, had a very close relationship with their parents their entire lives, including the time period immediately preceding Mr. Duran's death. ECF No. 133-9 at 1–2; ECF No. 133-11 at 1–2.[4]

On September 15, 2015, the morning following Mrs. Duran's death, Mr. Duran was at home with his son Robert. ECF No. 133-10 at 5. The two had slept in the living room of their shared home overnight. *Id.* Robert got out of bed to take a shower. *Id.* While Robert was in the shower, Mr. Duran told Robert, through the bathroom door, that he did not know what he was going to do because he had just lost his wife. ECF No. 133-10 at 5.

---

[2] For purposes of the Motion for Summary Judgment, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See* Standard for Summary Judgment below.

[3] The first name of Mr. Duran's wife and the number of years they were married is not in the evidence presented to the Court but is taken from the Complaint. The Court cites this information, which is immaterial to the Motion, for background purposes only. The other limited citations to the Complaint in this Order are similarly deemed immaterial but made for background purposes only, unless otherwise noted.

[4] The Court notes that the degree of closeness of each Plaintiff with Mr. Duran is relevant to its analysis of loss of consortium under New Mexico law. The specific facts regarding the relationship between Sally and her father, as well as Robert and his father, will be set forth in more detail in Factual Background sections B and C below.

Mr. Duran then wandered away from the home unexpectedly, roaming through the neighborhood in a disoriented state. *See* ECF No. 1-1, ¶¶ 62–63.

Sometime after Mr. Duran left the home, numerous BCSO deputies responded to a call from a woman concerned about Mr. Duran, who appeared distressed and was carrying a knife. *See* ECF No. 122, UMF 3. The responding deputies ordered that Mr. Duran drop the knife, but he did not comply with the deputies' commands. ECF No. 122, UMF 4. The deputies' plan was to shoot PepperBall projectiles at Mr. Duran, which would affect his "sensory glands" and also cause "pain compliance." ECF No. 133-3 at 3. If the projectiles did not work, their plan was to deploy a muzzled dog (K-9 unit) to take Mr. Duran to the ground without being bitten. ECF No. 133-3 at 4.

In an attempt to secure him, the deputies shot numerous PepperBall projectiles at Mr. Duran. ECF No. 122, UMF 5; ECF No. 133, Response to UMF 5.[5] Despite multiple projectiles hitting him, the projectiles did not have the desired effect of subduing him, and Mr. Duran was still holding the knife. ECF No. 133-6 at 2. A BCSO sergeant then released a K-9 unit during the incident, and the K-9 unit knocked Mr. Duran down. ECF No. 122, UMF 6; ECF No. 133, Response to UMF 6. Mr. Duran died on October 15, 2015. ECF No. 122, UMF 7.[6] According to the Medical Investigator, wounds from the PepperBall system were a contributing factor to Mr. Duran's death. ECF No. 133-7 at 2.

---

[5] In Plaintiffs' Response (ECF No. 133), Plaintiffs have presented additional facts to the Court, without following the applicable Local Rule. *See* D.N.M.LR-Civ. 56.1(b) (Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.). The Parties are reminded to follow the applicable Local Rules of Civil Procedure in the future.

[6] Plaintiffs claim to dispute the facts stated in UMF 7, but the Court determines that the additional facts presented by Plaintiffs (ECF 133, Response to UMF 7) do not show a genuine dispute of material fact. Instead, Plaintiffs' Response to UMF 7 improperly states additional facts. *See* D.N.M.LR-Civ. 56.1(b). Ultimately, the Court determines that this issue is immaterial.

At the time of his death, Mr. Duran had two surviving children, Plaintiffs Sally and Robert. *See* ECF No. 133-9 at 1; ECF No. 133-11 at 1. The facts pertaining to their respective loss of consortium claims are stated in more detail in the sections that follow below.

### B. Facts Regarding Sally Duran

Sally is Mr. Duran's daughter. ECF No. 122, UMF 8. Sally did not live with Mr. Duran or rely directly on her parents to support her financially. ECF No. 133, Response to UMF 14; ECF No. 133-8 at 2; ECF No. 133-9 at 1. However, she did share several household costs and responsibilities with her father, and she spoke with him and saw him every day. ECF No. 133-9 at 1. Sally would contribute to the cost of food, and would help her father prepare food, for the household. ECF No. 133-11 at 2. Her father was there to help her with various things, including fixing her car, changing her oil, helping her with flat tires no matter where she was, and helping her with yard work at her home. ECF No. 133-9 at 1. Prior to stepping down from managerial duties at Blake's, her longtime employer (*see* next paragraph), Sally spoke with her father every day at six in the morning, before she went to work. ECF No. 133-9 at 2.[7] For many years, her father would call her every single morning to wake her. *Id.;* ECF No. 133-8 at 4. Every day, after

---

[7] The Court is mindful of the fact that Sally was not working mornings anymore as of the date of her father's death in 2015, and had not worked mornings since 2013 or 2014, when she began working the night shift in order to help her family during the day. *See* ECF No. 133-8 at 2; ECF No. 133-9 at 2. Given that there is no indication that Sally's testimony was somehow falsified, the Court does not find sufficient cause that any of Plaintiffs' evidence should be stricken. Instead, the Court will draw a reasonable inference, in favor of Plaintiffs, as follows: *Sally spoke with her father every day at six in the morning, until she stepped down from managerial duties in order to take care of her parents, after which time she assisted her parents during the day, on a regular basis.* The Court notes that the ultimate finder of fact may or may not view the evidence in such a favorable light at trial, but the Court has provided the above summary of facts for purposes of the present Motion.

her shift was over, she would go to her parents' home to eat, watch the news, help with chores around the house, and help to take care of her mother. ECF No. 133-9 at 2. Sometimes she brought food, but most of the time she ate the food her father cooked. *Id.*

Sally worked as a manager for Blake's Lotaburger for 25 or 26 years, including serving as a manager for Blake's during a portion of that time. ECF No. 122, UMF 13; ECF No. 133, Response to UMF 13. Sally stepped down as a manager in 2013 or 2014 and began working the night shift, in order to help her family, including Mr. Duran, during the day. ECF No. 133-8 at 2; ECF 133-9 at 2.[8] After she stepped down from managerial duties at Blake's, Sally helped her mother and father around their house. ECF No. 133-9 at 1.

Sally would consult her father if she ever had an important decision to make. ECF No. 133-9 at 2. Sally was never married; she had one domestic partner during her lifetime, but that was many years ago. ECF No. 133-8 at 3. Her only child died in 2004 at the age of 33. ECF No. 133-9 at 1. Her father was very important to her emotional wellbeing. *See generally id.* at 1–2.

## C. Facts Regarding Robert Duran

Robert is Mr. Duran's son. ECF No. 122, UMF 9. Robert has lived at his parents' home since his birth in 1965. ECF No. 122-1 at 4; ECF No. 133-10 at 2. Robert's parents, including Mr. Duran, never made Robert pay rent or buy his own food. ECF No. 122-1 at 4. Mr. Duran was diagnosed with cataracts in his seventies, and after that, he no longer

---

[8] The record is unclear as to whether Sally stepped down from managerial duties in 2013 or 2014. *See* ECF No. 133-8 at 2; ECF No. 133-9 at 2. The Court determines that this issue is immaterial to the present Motion.

drove a car. ECF No. 133-11 at 2. For approximately fifteen years preceding Mr. Duran's death, Mr. Duran and his wife depended on Robert to drive them everywhere they needed to go. ECF No. 133-11 at 2. Although Mr. Duran did not drive, Robert and Mr. Duran did share other household responsibilities such as cleaning and yard work. *Id.* After Mrs. Duran became ill, Mr. Duran and Sally cooked for Robert on a regular basis. *Id.* Robert was responsible for paying household bills, using both his and his parents' money. *Id.* Robert did not cook, but he contributed to the cost of food that he and his family ate together. *Id.* Robert considered it his "life's calling to care for [his] parents as they aged." *Id.* at 1.

Throughout his life, Robert worked various jobs, including jobs at Sherwin-Williams and Parts Plus. ECF No. 122, UMF 21. Sometime after Robert's mother became ill between 2009 and 2012, Robert stopped working, in order to take care of his mother full time. *See* ECF No. 122-2 at 2. Robert and his father, Mr. Duran, shared responsibility for taking care of Robert's mother, including bathing her, moving her from her bed to her wheelchair, and feeding her. ECF No. 133-11 at 2. During this time, Robert's parents would still feed him, and he would use his savings from his past jobs to help his parents. *See* ECF No. 122-2 at 3.

Robert never married, and he does not have any children. ECF No. 133-11 at 1. Due to his mother's health condition, Robert and his father, Mr. Duran, often would sleep on rollout beds in the family's living room. *Id.* at 2; ECF No. 133-10 at 5. The two would wake up at 5:00 a.m. the following morning to put the beds away and begin to care for Robert's mother again. ECF No. 133-11 at 2. Robert and his father would discuss important life decisions, including whether to put Mrs. Duran in a nursing home. *Id.* The

7

two would watch television together, listen to music together, and talk about the news. *Id*. According to Robert, he and his parents "did everything" together. *Id*. Robert was his "father's power of attorney." *Id*. Robert's emotional wellbeing suffered, and in his words, he "lost [his] world," when his father died. *Id*.

## DISCUSSION

### I.   Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim.[9] *Id*. at 248.

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the nonmovant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing

---

[9] Several of the facts presented by the parties are immaterial under the standard set forth in *Anderson*. The Court acknowledges that some of the facts, although immaterial, are helpful for the purpose of providing background and context of the case. If material, the Court will apply these facts, as necessary, in the Analysis section of this Memorandum Opinion and Order.

sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (internal quotation marks omitted).

It is not the Court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Rather, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) ("When applying th[e summary judgment] standard, [the court] view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party.") (internal quotation marks omitted). However, summary judgment may nevertheless be granted where "the evidence is merely colorable, or is not significantly probative." *Anderson*, 477 U.S. at 249–50.

## II.   Summary of Applicable Law

The New Mexico Supreme Court has recognized common-law loss of consortium since 1994, when it first applied the doctrine to married spouses. *See Romero v. Byers*, 872 P.2d 840, 842–45 (N.M. 1994). It has since allowed loss of consortium claims in other contexts, including grandparents and unmarried cohabitants. *See Fernandez v. Walgreen Hastings Co.*, 968 P.2d 774, 782 (N.M. 1998) (grandparents); *Lozoya v. Sanchez*, 66 P.3d 948, 950–51 (N.M. 2003) (unmarried cohabitants). The New Mexico Court of Appeals has also recognized the availability of loss of consortium claims in the context of parents and siblings of deceased adults, and even when ruling against a particular

plaintiff, it has been unwilling to foreclose, as a matter of law, the ability to recover for other types of lost relationships. *See Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't*, 79 P.3d 836, 841 (N.M. Ct. App. 2003) (parents and siblings of deceased adult); *Wachocki v. Bernalillo Cnty. Sheriff's Dep't*, 228 P.3d 504, 519 (N.M. Ct. App. 2009) (sibling may recover in loss of consortium claim, but not based on facts of that particular case), *aff'd*, 265 P.3d 701 (N.M. 2011).

Generally, a party may recover for loss of consortium if the evidence shows that the party's relationship with the decedent was "sufficiently close financially, socially, or both, and if it was foreseeable that the injury to [the d]ecedent would harm the relationship." *Wachocki*, 228 P.3d at 518 (citing *Fitzjerrell*, 79 P.3d at 841) (internal quotation marks omitted). The determination of who can recover for loss of consortium is based on facts establishing the quality of a relationship, not on a legal definition establishing or rejecting one. *Fitzjerrell*, 79 P.3d at 838 (citing *Lozoya*, 66 P.3d at 955). "Although imposition of a legal duty is a legal question for the court, oftentimes it is dependent on a factual determination, which [a court entrusts] to the jury." *Lozoya*, 66 P.3d at 955. "It is appropriate that the finder of fact be allowed to determine, with proper guidance from the court, whether a plaintiff had a sufficient enough relational interest with the victim of a tort to recover for loss of consortium." *Id.* at 955–56. However, when a party cannot put forth sufficient facts showing the key element of "mutual dependence," a court may rule, as a matter of law, that the standards for loss of consortium are not met. *See, e.g., Wachocki*, 265 P.3d at 704 (concluding that "mutual dependence is the key element").

### A.  Closeness of the Relationship with the Decedent

To determine whether a claimant for loss of consortium has a sufficiently close relationship with the decedent, past New Mexico courts have considered multiple relevant factors including, but not limited to, the following: duration of the relationship; mutual dependence; common contributions to a life together; shared experience; living in the same household; financial support and dependence; emotional reliance on each other; qualities of their day to day relationship; and the manner in which they related to each other in attending to life's mundane requirements. *See, e.g., Fitzjerrell*, 79 P.3d at 840 (citing *Lozoya*, 66 P.3d at 957) (overruled on other grounds by *Heath v. La Mariana Apts.*, 180 P.3d 664 (N.M. 2008)). However, in an effort to streamline the analysis of whether the claimant and injured parties shared a sufficiently close relationship, the New Mexico Supreme Court has more recently held that "mutual dependence is the key element," not any particular relationship or factual test. *See Wachocki*, 265 P.3d at 704 (moving away from the multi-factor test and toward a more uniform analysis that focuses on "mutual dependence").

A relationship that creates a compensable interest is one that is intimate, protective, interdependent, and intertwined in functional (the way the people in the relationship meet day-to-day situations together), financially interdependent, and temporal ways (spending time together at least to the extent of living together in the same household). *Fitzjerrell*, 79 P.3d at 840. The elements are flexible in scope. *Id.* at 841. The legal availability of relief depends on the factual determination of whether a plaintiff has a significant enough relational bond with the decedent to recover for loss of consortium. *Id.*

**B. Foreseeability of Harm**

The purpose of the loss of consortium cause of action is not to compensate claimants for grief they suffer as a result of their own upset but to compensate an injury to a relationship they shared with the injured or deceased person. *Fitzjerrell*, 79 P.3d at 840–41. Loss of consortium is thus derivative of other injuries and not an injury in itself. *Id.* at 841. Accordingly, a duty to a prospective plaintiff springs only from the foreseeability of injury to that close and intimate bond. *Id.*

Injuries to certain types of relationships are commonly recognized as foreseeable, such as married couples. *See, e.g., Fitzjerrell*, 79 P.3d at 840 (The injury to the close relationship typically shared by a husband and wife is foreseeable because "there should be nothing surprising about a spousal relationship involving companionship, support, society, comfort, aid, and protection.") (citing *Romero*, 872 P.2d at 844). However, the New Mexico Supreme Court has recognized that injuries to other types of relationships may be foreseeable as well. For example, in *Fernandez*, the court concluded that a grandmother might be able to recover for loss of consortium where she had been the guardian, caretaker, and provider of parental affection to her deceased twenty-two-month-old granddaughter. 968 P.2d at 784. Under those facts, the court stated that a loss of consortium claim could be foreseeable, where

> (1) the victim was a minor;
>
> (2) the plaintiff was a familial care-taker, such as a parent or grandparent, who lived with and cared for the child for a significant period of time prior to the injury or death;
>
> (3) the child was seriously physically injured or killed; and

> (4) the plaintiff suffered emotional injury as a result of the loss
> of the child's companionship, society, comfort, aid, and
> protection.

*Id.*[10] Although *Fernandez* has not been overruled, New Mexico courts now focus on the

concept of "mutual dependance," rather than developing a new multi-factor test for every

type of close relationship that may exist. *See Wachocki*, 265 P.3d at 704 (declining to

establish a specific multi-factor test for sibling loss of consortium claims but instead

determining that "mutual dependence is the key element"). A specific relationship test is

not required in order for an injury to be foreseeable, as long as "mutual dependence"

exists. *See id.* at 703–04 (although other jurisdictions draw the line at particular

relationships, New Mexico does not draw such a line, so long as the facts demonstrate a

sufficiently close, "mutually dependent" relationship). [11]

---

[10] As part of its foreseeability analysis, the court in *Fernandez* also noted, "In [New Mexico], it is not uncommon for several generations of a family to live in the same home." 968 P.2d at 784. Although the court's opinion in *Fernandez* did acknowledge the special relationship between grandparents and grandchildren in the New Mexico Grandparent's Visitation Privileges Act, it ultimately (and most importantly) focused on the specifics of the relationship between the minor child and the grandparents, holding that foreseeability could exist when the above four factors were met. *Id.*

[11] Defendants argue that the *Solon v. WEK Drilling Co.* case is fatal to Plaintiffs' claims for loss of consortium, because it is unforeseeable, as a matter of law, that adult children would be in a close and intimate relationship with their father. *See* ECF No. 122 at 10 (citing *Solon v. WEK Drilling Co., Inc.*, 829 P.2d 645, 650 (N.M. 1992)). Of course, *Solon* was decided before New Mexico even recognized loss of consortium. Although the New Mexico Supreme Court did not explicitly overrule *Solon*, it is apparent that New Mexico law has expanded so significantly since *Solon* was decided, to the point that *Solon* no longer bars certain categories of claims, as it may have done in 1992. *See Wachocki*, 265 P.3d at 704 (determining that although the facts of that particular case did not support a loss of consortium claim, a future loss of consortium claim could be available under a different set of facts, "where the facts demonstrate that two siblings shared a mutually dependent relationship"); *see also Rodriguez v. Del Sol Shopping Ctr. Assocs., L.P.*, 326 P.3d 465, 468 (N.M. 2014) (Foreseeability as it relates to breach of duty is a general analysis and does not require that the particular harm to the plaintiff have been anticipated. Foreseeability does not require that the particular consequence should have been anticipated, but rather that some general harm or consequence be foreseeable.) (internal quotation marks and citations omitted).

### III.     Analysis

**A. There is a genuine dispute of material fact regarding the closeness of each Plaintiff's relationship with their father, for purposes of their loss of consortium claims, under New Mexico law.**

Given Plaintiffs' facts illustrating the immense closeness that Sally and Robert shared with their father in the years leading up to his death, the Court cannot conclude, as a matter of law, that Sally and Robert have failed to establish loss of consortium under New Mexico law. Instead, the facts suggest that each child's respective relationship with their father was sufficient to meet the standard for loss of consortium, for purposes of a motion for summary judgment. The Court's rationale is explained in more detail below.

#### i.  Decedent's Relationship with Plaintiff Sally Duran

Sally has presented sufficient facts to show that she and her father were in a "mutually dependent" relationship as defined by New Mexico law. Specifically, she has shown that she had an intimate, protective, interdependent, and intertwined life with her father, in multiple ways. This includes, for instance, the fact that she did not just see or speak with her father frequently: She saw or spoke with him daily, particularly in the months and years leading up to his death. She shared routine household responsibilities with her father, contributed to the cost of food, and would help her father prepare food for the household on a regular basis. She relied on her father to help her with various things, including car troubles, routine car maintenance, waking her up in the mornings for many years, cooking food for her on an almost daily basis for many years, and giving her advice on important life decisions. Other than her mother and brother (who lived in the same household as her father), Sally had no significant close relationships, given that her son had died many years ago, and she had split from her life partner long before her father's

14

death. She also quit her managerial position and worked the night shift at Blake's in order to help her family, including her father, during the day. The above examples, when viewed in the light most favorable to Plaintiffs, illustrate "mutual dependence" and thus serve as sufficient facts to defeat summary judgment on Sally's claim for loss of consortium.

Although living together in the same household has been an important factor for the courts, it is not an essential requirement, particularly where other facts supporting the strength of the relationship are strong. The key element for any loss of consortium claim is "mutual dependence," not strict adherence to any specific factual test. *See Wachocki*, 265 P.3d at 704 (stating that the multi-factor analysis "should be streamlined to accommodate different types of relationships" and finding that no one factor is essential, other than perhaps "mutual dependence.")[12]

At a minimum, Sally has put forth sufficient facts showing that she had a much closer relationship with her father than did the party that could not seek damages for loss of consortium in *Wachocki*, for instance. She has put forth sufficient facts showing that she spent substantial, meaningful time with her father on a daily basis, that she depended on her father for daily needs (and vice-versa), and that she actively participated in his wellbeing and care, much like the grandparents in *Fernandez*. Perhaps even stronger

---

[12] The Court has reviewed the case of *Silva v. Lovelace Health System, Inc.*, which involved loss of consortium claims brought by the parents and siblings of an adult woman who committed suicide. *See* 331 P.3d 958, 961 (N.M. Ct. App. 2014). With regard to the relationship between the decedent and her parents, the New Mexico Court of Appeals determined that the plaintiffs had not set forth sufficient facts supporting their loss of consortium claims. *See id.* at 968. Although the court noted, for instance, that the decedent "was not a member of her parents' household," ultimately the focus of the court's analysis was the issue of "mutual dependence," including whether decedent was "involved in her parents' day-to-day decisions or fulfillment of everyday requirements." *Id.* The *Silva* case differs from the present case because Sally has set forth credible facts showing that she was, in fact, involved in her father's day-to-day decisions and fulfillment of everyday requirements. Therefore, to the extent that *Silva* may apply to the present case, the Court determines that the facts of the present case are clearly distinguishable from those in *Silva*, when viewed in the light most favorable to Plaintiffs.

than the relationship the grandparents had with their two-year-old grandson in *Fernandez*, Sally had an intimate daily relationship with her father for many years, if not decades, immediately preceding his death. Viewing the facts in the light most favorable to Plaintiffs, Sally and her father, Mr. Duran, meet the factors set forth in *Fernandez, Wachocki,* and other New Mexico cases regarding loss of consortium. Therefore, judgment in favor of Defendants as a matter of law would be inappropriate.

### ii.  Decedent's Relationship with Plaintiff Robert Duran

Robert has made an even stronger showing that he and his father were in a "mutually dependent" relationship as defined by New Mexico law. For instance, Robert lived at his parents' home his entire life, and he never had to pay rent or buy his own food. He took care of his parents, particularly during the years preceding his father's death. When his father could no longer drive, he drove his father and mother everywhere they needed to go. He shared other household responsibilities with his father, including cleaning and yard work. Robert did not cook but often relied on his father and sister to prepare meals for him. He paid his parents' bills using both his and their money, and he contributed to the cost of food that he and his family ate together. As his parents aged, he stopped working completely, in order to help his father take care of his mother. Similar to his sister, Robert was unmarried and did not have children in the years leading up to his father's death (or, in his case, at any time during his lifetime). Robert relied on his father for advice on important life decisions, and he spent time with his father doing mundane things like watching television, listening to music, and talking about the news. Based on the facts presented, Robert has shown that he had an intimate, protective, interdependent, and intertwined life with his father, in multiple ways.

16

The above facts, when viewed in the light most favorable to Plaintiffs, clearly illustrate "mutual dependence" and thus serve as sufficient facts supporting Robert's claim for loss of consortium. Robert has shown that the relationship between him and his father, Mr. Duran, meets the factors set forth in *Fernandez, Wachocki,* and other New Mexico cases regarding loss of consortium. Therefore, judgment in favor of Defendants as a matter of law would be inappropriate.

### B. Plaintiffs have made a sufficient showing that the harm caused to the relationship between each of them and their father was foreseeable.

Applying the standards set forth in existing New Mexico case law, the Court cannot conclude, as a matter of law, that the harm caused to the relationship between either Sally or Robert, and Mr. Duran, was unforeseeable.

Although the New Mexico Supreme Court's decision in *Fernandez* was not intended to serve as a bright-line test, applying some of the factors outlined in of *Fernandez* to the present case illustrates that, at the very least, a genuine dispute of material fact exists regarding whether the harm to the relationship was foreseeable.[13] Viewing the facts in the light most favorable to the Plaintiffs, as analyzed in Section III(A) above, each of them has put forth sufficient facts showing some or all of the following: (1) the decedent was an elderly family member; (2) Plaintiff was a familial care-taker, who lived with, and cared for, the decedent for a significant period of time prior to the injury or death; (3) the decedent was seriously physically injured or killed; and (4) Plaintiff suffered

---

[13] As already stated, although prior cases have not been explicitly overruled, the New Mexico Supreme Court now focuses on the concept of "mutual dependance," rather than developing a new multi-factor test for every type of close relationship that may exist. *See Wachocki*, 265 P.3d at 704. Regardless of whether the Court applies the specific factors in earlier cases (such as *Lozoya* or *Fernandez*), or the more general "mutual dependence" standard in *Wachocki*, it nevertheless arrives at the same result.

emotional injury as a result of the loss of the decedent's companionship, society, comfort, aid, and protection. *See Fernandez*, 968 P.2d at 784 (applying a similar standard to minor children, using facts applicable to a minor child). As previously stated, Robert clearly meets this standard, and although Sally did not live with her father, she was very close to him and interacted with him on a daily basis, such that New Mexico law does not bar her claims, *per se*. Perhaps more important, the bond between Sally and her father was as close as, if not much closer than, the relationships described in *Wachocki*, *Fernandez*, and other precedential New Mexico cases. *Id.; see also Wachocki*, 228 P.3d at 519 (it is foreseeable that one who assumes the role of a primary care giver in the life of a life of a small child is "largely consumed by the responsibility and that the obligation to the child becomes a defining component in one's life."). Viewing the facts in the light most favorable to Plaintiffs, they (and each of them) have set forth sufficient facts showing, for instance, that their lives were consumed by the responsibility of helping their father as he aged, that they both gave up personal opportunities (including job opportunities) to be with their father on a daily basis, and that their obligations to their father were a defining component in each of their lives. Most important to the Court's analysis, each of them has put forth sufficient facts demonstrating a degree of "mutual dependence" that meets the standard set forth in *Wachocki*, 265 P.3d at 703–04.

The Court determines that Plaintiffs have set forth sufficient facts illustrating that the harm to the relationship between either named Plaintiff and Mr. Duran was sufficiently foreseeable, and New Mexico law supports this conclusion. Therefore, summary

judgment would be inappropriate on the issue of foreseeability of harm to the relationship between either Plaintiff and Mr. Duran.[14]

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment, filed on October 29, 2020, ECF No. 122, is hereby **DENIED**.

**IT IS SO ORDERED.**

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE

---

[14] Defendants appear to contend that the Court should dismiss Plaintiffs' loss of consortium claims based on failure to plead loss of consortium sufficiently (*see* ECF No. 122 at 9), but Defendants completely failed to develop this argument, and therefore the Court declines to consider it. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) ("We will consider and discuss only those contentions that have been adequately briefed for review."). Although the Court determines that Defendants have failed to develop any argument regarding failure to plead loss of consortium, the Court notes for the record that Plaintiffs did plead facts supporting loss of consortium under New Mexico law. *See, e.g.,* ECF No. 1-1, ¶ 6 ("Both Sally and Robert enjoyed a close and intimate relationship with Fidencio Duran and bring this claim in their individual capacities"). Additionally, as part of each of their claims (strict liability and negligence), Plaintiffs pleaded damages for "loss of consortium." *Id.*, ¶¶ 103, 111.