## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CELESTINA SALLY DURAN, Individually
and as Personal Representative of the
Estate of Fidencio Duran;
and ROBERT DURAN,

      Plaintiffs,

v.                                                            Civ. No. 1:18-cv-01062 MIS/LF

UNITED TACTICAL SYSTEMS,
LLC d/b/a PEPPERBALL; ADVANCED TACTICAL
ORDNANCE SYSTEMS, LLC d/b/a PEPPERBALL;
and PERFECT CIRCLE PROJECTILES, LLC,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Defendants Advanced Tactical Ordnance
Systems LLC ("ATO") and Perfect Circle Projectiles, LLC ("PCP")'s Motion for Summary
Judgment. ECF No. 124. United Tactical Systems, LLC ("UTS") joined in the Motion but
did not submit its own briefing. ECF No. 126. Plaintiffs filed their Response, Defendants
filed their Reply, and Plaintiffs filed their Surreply. ECF Nos. 141, 148, 155.[1] Having
considered the parties' submissions, the record, and the relevant law, the Court will deny
the Motion.

---

[1] Plaintiffs' Surreply addressed the limited issue of whether the Declaration of Chief Deputy Justin
Dunlap should be excluded. *See generally* ECF No. 141-19.

## PROCEDURAL BACKGROUND

This is a case brought against Defendants for strict products liability (failure to warn and defective design) (Count I) and negligence (Count II) regarding the manufacturing, marketing, and sale of the PepperBall system, which generally consists of semi-automatic, high-pressure air guns that use compressed air to propel ball-shaped projectiles containing chemical agents against human targets for law enforcement purposes. Plaintiffs allege that Defendants are liable for the death of their father, decedent Fidencio Duran ("Mr. Duran"), who passed away after a September 15, 2015 incident between Bernalillo County Sheriff's Office ("BCSO") deputies and Mr. Duran involving the use of the PepperBall system. Defendants dispute many of Plaintiffs' allegations. On September 14, 2018, Plaintiffs filed the present lawsuit against Defendants in state court. *See generally* ECF No. 1-1. Defendants removed the case to this Court on the basis of diversity jurisdiction. *See* ECF Nos. 1, 7.[2]

The present Motion (ECF No. 124) seeks summary judgment on all of Plaintiffs' claims. Regarding Plaintiffs' strict liability claims, Defendants argue that under New Mexico law, (a) Plaintiffs cannot show a design defect in the PepperBall projectiles used on Mr. Duran; (b) Plaintiffs cannot establish their failure to warn claims; (c) Plaintiffs cannot show that PCP is liable as a component part manufacturer; and (d) Plaintiffs cannot show the PepperBall projectiles were the proximate cause of Mr. Duran's claimed injuries. Regarding Plaintiffs' negligence claims, Defendants argue that Plaintiffs cannot show that Defendants' negligence caused the injuries claimed by Mr. Duran's family

---

[2] All claims against Defendant Tippmann Sports, LLC were dismissed by stipulation, pursuant to Federal Rule of Civil Procedure 41(a). *See* ECF No. 109.

members. In their Response, Plaintiffs argue that they are able to put forth sufficient facts to create a genuine issue of material fact exists regarding their claims. Finally, in their Reply, Defendants request that the Declaration of Chief Deputy Justin Dunlap, cited in Plaintiffs' Response, be excluded as a sham affidavit. The Court will address each of Defendants' relevant arguments, and Plaintiffs' relevant responses thereto, in turn.

## FACTUAL BACKGROUND

The facts stated below are either undisputed or stated in the light most favorable to the nonmovant, for purposes of the present Motion:[3]

### A.  Facts Regarding the September 15, 2015 Incident

Decedent Fidencio Duran ("Mr. Duran"), was an 88-year-old man, 5'4" in height, and visually impaired. ECF No. 141-8 at 2; ECF No. 133-10 at 4.[4] He lost his wife of 67 years on September 14, 2015. ECF No. 141-18 at 2. The following day, apparently grief-stricken and disoriented, he wandered from his home in the South Valley of Albuquerque,

---

[3] For purposes of the Motion for Summary Judgment, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. See Standard for Summary Judgment *infra*. Here, the parties have presented both material facts, and facts that are either immaterial or genuinely disputed. The Court will not consider immaterial facts for purposes of deciding the Motion. Additionally, in response to several items contained in Plaintiffs' Additional Material Facts (ECF No. 141 at 14–18), Defendants make an argument that certain documents "ha[ve] not been made a part of the record" and are therefore "not adequate support" for the proposition cited. ECF No. 148 at 10–11 (Defendants' Response to Plaintiffs' Additional Facts B, D, E, G, H) (citing Fed. R. Civ. P. 56(c)(1)(A)). However, Defendants fail to explain how these documents are not a part of the record for purposes of Federal Rule of Civil Procedure 56(c)(1)(A). Given that Defendants have failed to make a sufficient showing of how or why these materials "ha[ve] not been made a part of the record," the Court will not consider this undeveloped argument. See *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) ("We will consider and discuss only those of her contentions that have been adequately briefed for our review.")).

[4] In multiple parts of Plaintiffs' Response (ECF No. 141), Plaintiffs appear to have presented additional facts to the Court, without following the applicable Local Rule. See D.N.M.LR-Civ. 56.1(b) ("Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies."). The Parties are reminded to follow the applicable Local Rules of Civil Procedure in the future.

and ended up at the home of a neighbor. ECF No. 141-14 at 2. The neighbor "heard screaming and yelling outside," looked out the window, and saw Mr. Duran standing outside without a shirt, wearing only one shoe. ECF No. 141-15 at 2. He was kicking the fence, and the neighbor's dogs were barking at him. *Id.* at 2-3. The neighbor wanted to help him, but she decided that was not a good idea, and called "242-COPS" (the City of Albuquerque's non-emergency line) instead. *Id.* at 3; City of Albuquerque Police Phone Numbers, http://www.cabq.gov/police/contact-the-police (last visited Sept. 30, 2022). She was then transferred to a number she believed to be 911. ECF No. 141-15 at 3. While the neighbor was on the phone with the dispatcher, Mr. Duran pulled out a knife on the dogs, and kept kicking, screaming and yelling at the dogs. *Id.* At that point, the neighbor became worried, and BCSO then responded to the call with deputies. *Id.*

When BCSO deputies arrived at the neighbor's home, Mr. Duran was still holding the knife, and the deputies distanced themselves from him. *See id.* The deputies offered him water and tried to talk to him, but he kept pulling the knife on them. *Id.* Deputies told Mr. Duran to drop the knife, but he responded, "[J]ust kill me, you have all those guns." ECF No. 141-13 at 1. With no progress being made, deputies made the decision (in one deputy's words) to use the "less-than-lethal [PepperBall]" system to subdue Mr. Duran. *Id.* Mr. Duran was once again told to drop the knife, but he refused. *Id.* At that point, deputies deployed multiple PepperBalls at Mr. Duran, while continuing to instruct Mr. Duran to drop the knife, but he did not drop the knife. *Id.* Several PepperBalls hit Mr. Duran's arms and torso.  ECF No. 124, UMF 31; ECF No. 141, Response to UMF 31. Deputies then deployed a police dog (K-9 unit), which knocked Mr. Duran to the ground. ECF No. 141-13 at 1. Once Mr. Duran was on the ground, a deputy removed the knife

from his hand. *Id.* An injured Mr. Duran was transported to UNM Hospital for evaluation of his physical injuries and mental health. *Id.*

As a result of the police dog knocking him to the ground, Mr. Duran broke his hip. ECF No. 124, UMF 29. He also suffered several abrasions and lacerations to his arms from the PepperBalls that BCSO deputies shot at him. *Id.*, UMF 31; ECF No. 141, Response to UMF 31. After he was admitted to the hospital, doctors removed numerous "plastic shards" and "multiple pieces of broken red plastic" from the wounds in his arm. ECF No. 141-8 at 2; ECF No. 141-21 at 1–2. He suffered blood loss due to injuries from the PepperBalls. ECF No. 141-24 at 2. He required increased pain medication and suffered decreased mobility due to his hip fracture and injuries from the PepperBalls. *Id.* As a result of his hip fracture, lacerations from the PepperBalls, and prior lung and heart conditions, he developed pneumonia. *Id.*; ECF No. 141-8, at 2. Ultimately, he suffered prolonged respiratory failure and was placed on a ventilator. ECF No. 124, UMF 33. He died on October 15, 2015, due to "complications of his hip fracture in the setting of [heart and lung disease]," and the "wounds of the arms from the [PepperBalls] were also contributing factors." ECF No. 141-8 at 2.

### B. Facts Regarding the Decision to Use PepperBall

In devising their plan to take Mr. Duran, deputies ruled out various methods of subduing Mr. Duran, including Taser, pepper spray, and beanbags, before settling on the PepperBall system and a muzzled canine. ECF No. 124, UMF 23. Because Mr. Duran was holding a knife, they also ruled out methods which would have required officers to be close to him. *Id.*, UMF 24. Deputies ruled out at least one product that specifically warned against use on the elderly, including Taser. ECF No. 141-19 at 2. Ultimately, as stated

5

above, deputies devised a plan to use the PepperBall system and a muzzled canine against Mr. Duran, in order to subdue him. ECF No. 141-19 at 2–3. BCSO personnel did not want to hurt Mr. Duran but to get him help. ECF No. 141-10 at 3; ECF No. 141-12 at 2. Their goal was to get compliance from Mr. Duran with the least amount of pain or damage. *See* ECF No. 141-10 at 3.

The principle architects of the plan, Chief Deputy Justin Dunlap and Lieutenant Craig Sevier, relied on the information available at the time, including PepperBall's claimed efficacy rate of 84–86% and PepperBall's statements regarding the safety of its product. ECF No. 141-19 at 2–3. This specifically included general statements about PepperBall neither prohibiting the use of PepperBall on the elderly nor warning that its product could penetrate elderly skin. ECF No. 141-19 at 2. Chief Deputy Dunlap also relied on personal knowledge about less-than-lethal alternatives, representations made in product materials or training, and BCSO Standard Operating Procedures. ECF No. 141, UMF N. If Chief Deputy Dunlap had been instructed not to use the PepperBall system on the elderly, he would not have used it on Mr. Duran. ECF No. 141-10 at 6. Likewise, Lieutenant Sevier later stated that he was not given information on the effects of PepperBall on elderly skin. ECF No. 141-9 at 2; ECF No. 141-20 at 7. Mr. Duran's injuries, including those to his arm, were not what either Chief Deputy Dunlap or Lieutenant Sevier had expected or had ever seen before. ECF No. 141-19 at 3; ECF No. 141-9 at 4.

### C. Facts Regarding the PepperBall System, User Training, and Warnings

PepperBall projectiles are small, plastic spheres (normally no more than two centimeters in diameter) and are typically filled with a powdered chemical substance. ECF No. 124, UMF 7. Generally speaking, the "PepperBall system" consists of a launcher,

accessories, projectiles, and training. *Id.*, UMF 6. The launcher at issue in the present case was an SA200 launcher manufactured by Tippmann Sports, LLC ("Tippmann"). *Id.*, UMF 8. Defendant ATO provided BCSO training in the use of the PepperBall system, including an instructor training course which allowed attendees to become certified to give PepperBall system user training to others. *See id.*, UMFs 9, 10; ECF No. 141, Response to UMF 9.[5] The instructor course covered the PepperBall system's technical components and specifications, tactical considerations, and safety guidelines. ECF No. 124, UMF 11; ECF No. 141, Response to UMF 11.[6] It also included a written test and gave participants the opportunity to use the system. ECF No. 124, UMF 11; ECF No. 141, Response to UMF 11. The PepperBall user training provided to BCSO officers consisted of a presentation, demonstration on loading and unloading the PepperBall system, and firing rounds at paper targets. ECF No. 124, UMF 13. The presentation materials used in the PepperBall user course contained various statements or warnings related to the safety of the PepperBall system. ECF No. 124, UMF 14.[7] For instance, the materials expressly

---

[5] The parties dispute the phrase "the purchase of ATO's assets by UTS in 2014," contained in the Motion: in their Response, Plaintiffs argue that Defendants are attempting to "divorce UTS from ATO and the training ATO provided to BCSO." *See* ECF No. 124, UMF 9; ECF No. 141, Response to UMF 9. In a separate order, the Court has already analyzed whether New Mexico's product line exception applies to Defendant UTS' 2014 purchase of ATO's assets, when the facts are viewed in the light most favorable to Plaintiffs. *See* ECF No. 173 at 14–18. To the extent necessary (and only to such extent), the Court determines that the law of the case regarding New Mexico's product line exception applies to the facts and arguments contained in the present Motion, particularly given that the facts and arguments in the present Motion are largely the same as those contained in UTS' prior motion. ECF No. 120.

[6] Plaintiffs dispute UMF 11, in part, arguing that Defendants "treated the training as a sales opportunity," rather than actually providing adequate training. *See* ECF No. 141, Response to UMF 11. The Court finds that there is no genuine dispute as to whether an "instructor course" was provided. If necessary, the Court will address the remaining disputes, including the adequacy of the training or warnings provided, in other parts of this Order.

[7] Having reviewed Plaintiffs' Response to UMF 14, ECF No. 141 (claiming that there were no statements "related to the safety" of the PepperBall system), the Court finds that there is no genuine dispute that the PepperBall user course contained various statements or warnings related to the safety of the

identified bruising, abrasions, and welts as effects of direct impact of a PepperBall projectile on a human target, and the materials stated that the PepperBall system may not work on the "[m]entally ill, drug abusers, [or] alcoholics." ECF No. 124-8 at 3, 5.[8] The materials advised users to follow the employer's policy regarding medical response and evaluation. *Id.* The materials warned users to "[f]ollow Department guidelines" regarding use of the PepperBall system on the elderly, but BCSO had no such written policy. *See id.* at 6; ECF No. 124, UMF 18. The materials stated that previous use of the system had not resulted in serious injuries, and it also stated that the system was safe to use at point-blank range. ECF No. 124, UMF 14.

### D. Facts Regarding Defendant PCP

From 2001 to 2014, PCP produced, among other things, inert-based and live-powder projectiles for use by law enforcement agencies. ECF No. 124, UMF 1; ECF No. 141, Response to UMF 1. During much of that period, ATO's predecessor, PepperBall Technologies, Inc. ("PTI"), would send irritant powder pre-manufactured to PCP, which would then assemble and load the proprietary powder into PepperBall projectiles. ECF No. 141, Response to UMF 1. The only period between 2005 and 2014 in which PCP did

---

PepperBall system. *See generally* ECF No. 124-8 (containing several statements and warnings related to the safety of the PepperBall system). If necessary, the Court will address the remaining disputes, including the adequacy of the training or warnings provided, in other parts of this Order.

[8] In ECF No. 124, UMFs 15, 17, Defendants assert other facts describing warnings provided regarding the PepperBall system, including (1) a warning of the risk of injuries to the head, neck, or spine (ECF No. 124-8 at 2; ECF No. 124-8 at 1); and (2) an advisory not to use white, glass-breaking PepperBall projectiles on human beings "unless deadly force can be justified" (*id.* at 8). The Court determines that these facts are immaterial to the present Motion. Viewed in the light most favorable to the Plaintiffs, the Decedent was not shot in the head, neck, or spine, and he was not shot by white, non-glass-breaking projectiles. *See* ECF No. 141-7 at 1 (photographs showing injuries to arms and torso); ECF No. 141-8 at 2 (OMI report noting wounds to hands and arms but not head, neck, or spine); ECF No. 141, Response to UMF 26 (citing evidence that Mr. Duran was injured by red, frangible projectiles).

not fill ATO and PTI's projectiles was a short break around July of 2007.[9] ECF No. 141-1 at 2. Additionally, PCP owned 50% of ATO.[10] ECF No. 134-5 at 10.

### E. Facts Regarding BCSO's 2012 Purchase of PepperBall Products

BCSO purchased 20 boxes of red PAVA-filled PepperBall projectiles from ATO in June 2012 and November 2012. ECF No. 134-6 at 1–5.[11] Prior to the date of Mr. Duran's injuries, at least two BCSO deputies received training in PepperBall instruction, thus enabling them to teach the use of the PepperBall system to other BCSO deputies. ECF No. 141-20 at 2; ECF Nos. 141-25, 141-26.[12] In turn, additional deputies received their PepperBall user certifications from BCSO instructors. *See* ECF Nos. 141-28–141-29.

---

[9] Defendants argue that there is insufficient evidence that PCP was the manufacturer of the projectiles at issue, citing to evidence that "various other entities also manufactured these projectiles, including Perfect Circle Paintball, Inc.[] and Jaycor Tactical Systems, Inc." However, as the parties are aware, these entities were no longer in existence as of the time period applicable to this lawsuit. *See* ECF No. 124-2 at 3 (Perfect Circle Paintball, Inc. changed its name and ownership in 2004); ECF No. 124-2 at 1–2, 7 (sometime in the early 2000s, Jaycor changed its name to PTI, which was subsequently purchased by another company, which then renamed itself PTI, and then later created a wholly owned subsidiary named PTI). Although the record is not clear as to whether other manufacturers existed, the Court has found no evidence suggesting that any entity other than PCP manufactured the projectiles at issue within five years preceding BCSO's purchase of its projectiles from ATO.

[10] Although Plaintiffs argue that "PCP was a 50% owner of ATO, intimately involved in the creation of the . . . PepperBall [s]ystem," ECF No. 141 at 34, the parties have not discussed whether, as a 50% owner of ATO, PCP would be liable under a theory of piercing the corporate veil or similar theory. The parties also have not provided enough facts regarding the relationship between PCP and ATO for the Court to determine whether this theory applies. Therefore, the parties have failed to develop this argument (if any). The Court also deems this fact immaterial for purposes of the present Motion.

[11] The invoice at issue states that BCSO's purchase was made from PepperBall Technologies, Inc. ("PTI"). However, ATO purchased PTI's assets on January 9, 2012. ECF No. 134-5 at 10. Therefore, viewed in the light most favorable to Plaintiffs, ATO already owned these assets as of the date of the sale, and instead, it is likely that the purchase order form had not yet been updated, even though ATO actually made the sale to BCSO. Also, with respect to Defendant UTS, the Court has already ruled regarding whether the "product line exception" applies to the PepperBall system, for summary judgment purposes. ECF No. 173.

[12] At least two deputies, Kmatz and Martinez, received either their first or follow-up PepperBall instructor certification training in 2012. *See* ECF No. 141-25 at 2; ECF No. 141-26. A sample of the 2012 user certification course materials that Deputy Kmatz used when training other BCSO deputies is contained in the record. ECF No. 124-8; *see also* ECF No. 124-6 at 5 (authenticating exhibit).

BCSO PepperBall user training consisted of viewing a PowerPoint presentation, deploying the PepperBall system on a firing range, and being shot with a projectile. ECF No. 141-11 at 2.

### F.  Expert Opinions of Charles Mesloh, Ph.D.

Plaintiffs' first expert, Charles Mesloh, Ph.D. ("Dr. Mesloh"), is an experienced law enforcement officer, scholar, and researcher.[13] ECF No. 125-2 at 6. He is currently a professor of criminal justice at Northern Michigan University. *Id.* at 17. According to Dr. Mesloh, PepperBall uses a synthetic chemical agent similar to oleoresin capsicum, which is made from hot peppers. ECF No. 125-2 at 10. Dr. Mesloh could not find a single study of PepperBall or its products that empirically studies its "effectiveness in [in]capacitating suspects." ECF No. 125-2 at 10. He noted that PepperBall training materials suggested an effectiveness rate of approximately 85%, which Defendants' witness Monte Scott claimed to be from a "U.S. Department of Justice study that references that number." *See id.;* ECF No. 141-5 (2012 PepperBall training materials noting that "14-16% of the population is not affected or is affected differently when exposed to chemical agents"). Given the apparent lack of studies to substantiate this figure, Dr. Mesloh and his former research institute conducted their own PepperBall experiments. ECF No. 125-2 at 11–14. Relevant to the present case, Dr. Mesloh identified several issues with the design and

---

[13] Defendants filed their Motion to Exclude Expert Testimony of Charles Mesloh. ECF No. 125. On August 26, 2022, the Court held a hearing on the Motion to Exclude. ECF No. 181. Prior to the hearing, the parties resolved all issues other than those listed in the parties' Joint Notice of Contested Opinions of Charles Mesloh. *See* Order Setting Daubert Hearing, ECF No. 178; Minute Order of Daubert Hearing, ECF No. 182. As to Contested Opinion No. 1, the Court denied the Motion to Exclude. ECF No. 182. As to Contested Opinion No. 2, the Court granted the Motion to Exclude. *Id.* Therefore, the Court will not consider Contested Opinion No. 2 for purposes of the present Motion but may consider the remaining opinions, to the extent material.

manufacturing of the PepperBall system that likely caused its efficacy rate to be well below 85% and perhaps lower than 60%. *Id.* The basis for Dr. Mesloh's conclusion that the efficacy rate was lower than 60% included the following relevant facts:

- Delivery system limitations (i.e., the PepperBall system does not target the face, whereas conventional OC spray delivers chemical agent directly to the face and eyes, making the effectiveness rate of PepperBall lower than that of conventional OC spray upon which earlier studies were likely based)

- Projectile limitations (i.e., PepperBall projectiles exhibit "unusual flight behavior," making them less likely to reach the target and deliver the chemical agent in an expected manner, making the effectiveness rate lower than that of conventional OC spray upon which earlier studies were likely based)

- Outdoor environment limitations (i.e., PepperBall system works less effectively in windy or open-air environments than in closed-room environments, making the effectiveness rate lower than that of conventional OC spray upon which earlier studies were likely based).

*See id.* at 16–17.[14]

---

[14] Defendants attack the opinions of Dr. Mesloh, arguing that Dr. Mesloh "did not know who manufactured the projectiles he used in his studies; if the projectiles were manufactured using the same process as the projectiles at issue in this matter; or in what year the projectiles he studied were manufactured." ECF No. 124 at 14. However, as already stated, the record does not reflect that any manufacturer other than PCP produced the projectiles at issue in this case or in the studies cited by Dr. Mesloh, since the early 2000s. *See* n.11 *supra*. Given that the record does not provide any basis for the Court to conclude that an entity other than PCP manufactured the PepperBall projectiles at issue, Defendants' arguments are irrelevant.

### G. Expert Opinions of Seth Stoughton[15]

Plaintiffs' second expert, Seth Stoughton ("Mr. Stoughton"), is an experienced law enforcement officer, scholar, and researcher. ECF No. 121-2 at 2–4. In addition to at least five years of sworn law enforcement experience, he also has served as an investigator for alleged civil and criminal violations, and he has conducted academic research on policing for more than seven years. *Id.* at 2–3. He currently serves on the faculty of the University of South Carolina School of Law, where he teaches in the area of criminal law and procedure. *Id.* at 3. Previously, he served as a two-year research fellow at Harvard Law School, where he researched the same topics. *Id.* He has published several articles on police tactics and the use of force, and he was the principal author of a 2020 book entitled *Evaluating Police Uses of Force*, published by NYU Press. *Id.*

According to Mr. Stoughton, the PepperBall vendor failed to properly educate officers on the capabilities, limitations, and risks of the PepperBall system. Specifically, and in relevant part, Mr. Stoughton asserts the following opinions:

- The vendor described the PepperBall system as "nonlethal." In the expert's opinion, this was inappropriate and misleading because it could lead officers to conclude that the PepperBall could not cause serious bodily injury or

---

[15] Defendants filed their Motion to Exclude Testimony and Opinions of Plaintiffs' Expert Witness Seth Stoughton. ECF No. 121. On August 26, 2022, the Court held a hearing on the Motion to Exclude. ECF No. 181. Prior to the hearing, the parties resolved all issues other than those listed in the parties' Joint Notice of Contested Opinions of Seth Stoughton. *See* Order Setting Daubert Hearing, ECF No. 178; Minute Order of Daubert Hearing, ECF No. 182. As to all remaining contested opinions, the Court denied the Motion to Exclude. ECF No. 182. Therefore, to the extent material to the present Motion for Summary Judgment, the Court may consider Mr. Stoughton's expert opinions.

death, except when targeted at the head, neck, or spine, or when a glass-shattering round was used against a person.

- The vendor inappropriately failed to inform the agency about the risks of using the PepperBall system on elderly subjects. In the expert's opinion, this was inappropriate because it affected an officer's risk-benefit calculation, particularly when evaluating whether to use force against the elderly.

*Id.* at 16–24. Finally, according to Mr. Stoughton, a vendor's failure to properly educate officers about the capabilities, limitations, and risks of a weapon increases the likelihood that the weapon will be misused. ECF No. 121-2 at 24–27.

**DISCUSSION**

## I.    Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id.* at 248.[16]

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the nonmovant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998)) (internal quotation marks omitted).

It is not the Court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Rather, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). However, summary judgment may nevertheless be granted where "the evidence is merely colorable, or is not significantly probative." *Anderson*, 477 U.S. at 249–50.

---

[16] Several of the facts presented by the parties are immaterial. The Court acknowledges that some of the facts, although immaterial, are helpful for the purpose of providing background and context of the case. If material, the Court will apply these facts, as necessary, in the Analysis section of this Memorandum Opinion and Order.

## II.    Analysis

### A. A genuine dispute of material fact exists regarding the factual elements of Plaintiffs' defective design claims under New Mexico law. Therefore, the Court cannot grant summary judgment to Defendants on this issue.

In order to establish their claim for strict liability based on defective design, Plaintiffs must show that the PepperBall system presented an unreasonable risk of injury. *See* N.M. UJI Civ. 13-406 ("[A] supplier in the business of putting a product on the market is liable for harm caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use. Such a risk makes the product defective. This rule applies even though all possible care has been used by the supplier in putting the product on the market."). In turn, an unreasonable risk of injury is a risk which a reasonably prudent person having full knowledge of the risk would find unacceptable. N.M. UJI Civ. 13-407.

Plaintiffs have put forth evidence from which a jury could reasonably infer that the PepperBall system could and should have been designed in a manner that would not have resulted in the injuries suffered by Mr. Duran. Specifically, the PepperBall system was effective 60% or less of the time, thus increasing the likelihood that additional PepperBall projectiles must be used to subdue a suspect, increasing the risk of PepperBall projectile injuries—as occurred in the present case. Also, the PepperBall projectiles manufactured by PCP and sold by ATO presented a significant risk of penetrating the skin, which presented the risk of life-threatening injury to a suspect— again, as occurred in the present case. Viewing the evidence in the light most favorable to Plaintiffs, police were forced to use more and more PepperBall projectiles, in vain, to

subdue a non-compliant Mr. Duran, and in the process caused severe injuries, which the Medical Examiner characterized as contributing factors in his death. To the extent that Defendants dispute whether the above facts establish an unreasonable risk of injury, this dispute must be resolved by a jury. *See Smith ex rel. Bryco Arms*, 33 P.3d 638, 650 (N.M. Ct. App. 2001) (whether product as designed posed an unreasonable risk of injury is a jury determination); *Fernandez v. Ford Motor Co.*, 879 P.2d 101, 113 (N.M. Ct. App. 1994) (same).  The Court finds that, based on either of the above facts, Plaintiffs could prove to a reasonable jury that the PepperBall system posed an unreasonable risk of injury to Mr. Duran, due to a defective design. Therefore the Court must deny Defendants' Motion regarding Plaintiffs' defective design claims.

### B. Defendants are not entitled to summary judgment on Plaintiffs' failure to warn claims, nor have Defendants established their entitlement to any applicable defenses as a matter of law.

Failure to give an adequate warning is a cause of injury if, in light of all the circumstances of the case, an adequate warning would have been noticed and acted upon to guard against the danger. N.M. UJI Civ. 13-1429. Under New Mexico law, the adequacy of warnings is usually a question of fact; where a plaintiff presents some evidence that the warnings may have been inadequate, then summary judgment should not be granted. *See Rimbert v. Eli Lilly and Co.*, 577 F. Supp. 2d 1174, 1230 (D.N.M. 2008) (citing *Serna v. Roche Labs.*, 684 P.2d 1187, 1190 (1984); *Wilschinsky v. Medina*, 775 P.2d 713, 718 (N.M. 1989); *Michael v. Warner/Chilcott*, 579 P.2d 183, 187 (N.M. Ct. App. 1978); *Perfetti v. McGhan Med.*, 662 P.2d 646, 649 (N.M. Ct. App. 1983)).

In order to succeeed on their products liability claim for failure to warn, Plaintiffs must show that PepperBall either (1) failed to disclose the nature and extent of the danger

16

of the PepperBall system (N.M. UJI Civ. 13-1418(3)) or (2) inadequately communicated the product's risk, such that it could not reasonably be expected to reach persons using the product (N.M. UJI Civ. 13-1417). The Court finds that Plaintiffs have presented evidence to meet either of these requirements. For instance, Chief Deputy Dunlap stated that he and Lieutenant Sevier relied on PepperBall's claimed efficacy rate of 84–86% and PepperBall's statements on the safety of its product in deciding whether to use the PepperBall system on Mr. Duran. Further, Chief Deputy Dunlap stated that he would not have used the PepperBall system if he had been instructed not to use it on the elderly, and both he and Lieutenant Sevier stated that Mr. Duran's injuries were not what they had expected or had ever seen before. This is supported by Plaintiffs' expert witnesses, who stated that the efficacy rate was likely exaggerated, that the product was inappropriately described as "nonlethal," and that the vendor failed to inform BCSO about the risks of using the PepperBall system on elderly subjects. Similarly to the district court's ruling in *Rimbert*, this Court cannot say, as a matter of law, that the warnings were adequate, given that Plaintiffs have presented evidence to support their contention that the warnings were inadequate. Therefore, the Court must deny Defendants' Motion regarding Plaintiffs' failure to warn claims.[17]

---

[17] Defendants have argued that the "sophisticated user" defense applies to Plaintiffs' failure to warn claims, as a matter of law. Under this defense, when the user of a product knows or has reason to know of the product's hazards, the duty to warn is discharged. *Bellman v. NXP Semiconductors USA, Inc.*, 248 F. Supp. 3d 1081, 1140 (D.N.M. 2017) (citing *Johnson v. American Standard, Inc.*, 179 P.3d 905, 910–911 (Cal. 2008)). As Defendants admit, this defense has not yet been recognized by a New Mexico appellate court. However, in *Bellman*, our district court (Browning, J.) predicted that New Mexico courts would adopt the sophisticated user defense in negligent failure to warn claims. *Bellman*, 248 F. Supp. 3d at 1142–1143. Defendants in the present case have argued that New Mexico appellate courts would also recognize the sophisticated user defense in strict products liability cases as well. ECF No. 124 at 15. The Court finds that even if the doctrine applied, there would be a genuine dispute of material fact regarding whether BCSO deputies were sophisticated users, including whether they knew or had reason to know of the PepperBall system's hazards. *See, e.g.*, Factual Background § B, *supra* (Chief Deputy Dunlap and Lieutenant Sevier

**C. A genuine dispute of material fact exists regarding whether PCP was a component part manufacturer; also, Plaintiffs have put forth sufficient evidence that the product was unreasonably dangerous at the time it left PCP's control.**

Defendants have argued that Plaintiffs cannot establish that PCP allowed its component parts to be used in the PepperBall system without adequate warnings. ECF No. 124 at 20–21. For summary judgment purposes, the Court disagrees.

"Products liability" applies to the supplier of a component part which causes injury if, when added to or incorporated into the finished product, the component part is substantially unchanged or is in a condition in which it could have been reasonably expected to be used. N.M. UJI Civ. 13-1423. In order for PCP to be liable as a component part manufacturer, Plaintiffs must show that the component part was unreasonably dangerous at the time it left PCP's control. *See Parker v. E.I. Du Pont de Memours & Co., Inc.*, 909 P.2d 1, 7 (N.M. Ct. App. 1995).

Plaintiffs have presented sufficient evidence to show that PCP was directly involved in the production of the PepperBall system and that its component part (i.e., the PepperBall projectile itself) presented an unreasonable risk of injury at the time it left PCP's control. Specifically, Plaintiffs have shown that PCP was responsible for loading the PepperBall active ingredient into the proprietary PepperBall shells, making them ready for use in the PepperBall launcher. Further, Plaintiffs have shown that it is highly likely, if not certain, that PCP was responsible for manufacturing the actual shells at issue

---

were not fully aware of the products risks and may have made different decisions had the product training materials been different). Given that both of these persons may not have made the decision to use the PepperBall system if the information they received had been different, the Court cannot conclude that they knew or should have known of the product's risks. The parties are not prejudiced from arguing the defense prior to or during trial.

in the present case, given that there is no evidence that any other entity was responsible for manufacturing the shells during the time period applicable to the present lawsuit. Finally, Plaintiffs have shown that the PepperBall projectiles were unreasonably dangerous at the time that they left PCP's control, given that many of these same projectiles failed to work as intended against Mr. Duran, resulting in injuries that the Medical Examiner stated were contributing factors to his death.

The Court cannot conclude, as a matter of law, that the PepperBall projectiles at issue were not unreasonably dangerous at the time they left PCP's control. Instead, viewing the evidence in the light most favorable to Plaintiffs, it appears that the PepperBall projectiles at issue were unreasonably dangerous when they were sent by PCP in finished form to the product vendor. Therefore, the Court cannot grant summary judgment to PCP on any basis related to a component part manufacturer theory.

### D. Defendants have failed to show the absence of a genuine dispute of material fact regarding proximate cause.

Proximate cause is generally defined as "[a] cause that is legally sufficient to result in liability; an act or omission that is considered in law to result in a consequence, so that liability can be imposed on the actor." *Proximate Cause* (1), Black's Law Dictionary (11th ed. 2019). In New Mexico, a defective product is a cause of injury if it contributes to bringing about the injury and if the injury would not have occurred without it. N.M. UJI Civ. 13-1424. However, it need not be the only explanation for the injury, nor the reason that is nearest in time or place. *Id.* Rather, it is sufficient if it occurs in combination with some other cause to produce the result. *Id.* To be a "cause," the defective product must be reasonably connected as a significant link to the injury. *Id.* Proximate cause is an issue

of law when facts regarding causation are undisputed and all reasonable inferences drawn from those facts are plain, consistent and uncontradictory. *Pollock v. State of N.M. Hwy. and Transp. Dep't*, 984 P.2d 768, 770–71 (N.M. Ct. App. 1999). Where reasonable minds may differ on proximate cause, however, the issue is for the jury. *Id.*

The Court has already discussed, in detail, how a genuine dispute of material fact exists regarding whether ATO and PCP are strictly liable for Mr. Duran's injuries, including whether a design defect or failure to warn caused these injuries. *See* §§ A–C, *supra*. Given the genuine disputes of material fact that exist, the Court cannot conclude, as a matter of law, that the defective product (i.e., the PepperBall system or its component PepperBall projectile) was not the cause of Plaintiffs' injuries. Indeed, viewed in the light most favorable to Plaintiffs, the defective product was the cause of their injuries. Therefore, the Court cannot grant summary judgment to Defendants on the basis of proximate cause.

### E. Defendants are not entitled to summary judgment on Plaintiffs' negligence claims.

In order to prevail on a negligence claim, Plaintiffs would need to show the following: (1) defendants' duty to the plaintiffs, (2) breach of that duty, typically based on a reasonable standard of care, (3) injury to the plaintiffs, and (4) the breach of duty as cause of the injury. *Zamora v. St. Vincent Hosp.*, 335 P.3d 1243, 1249 (N.M. 2014). Because Defendants have only argued causation, the Court will focus on the element of causation. Plaintiffs have set forth sufficient facts to establish a genuine issue of material fact regarding the issue of whether the acts of Defendants caused injury to Mr. Duran, as more fully explained below.

Viewing the facts in the light most favorable to Plaintiffs, they have shown that BCSO purchased 20 boxes of red PAVA-filled PepperBall projectiles from ATO in June 2012 and November 2012, when PCP was manufacturing the PepperBall projectiles that ATO sold as part of the PepperBall system. On the date of the incident involving Mr. Duran, BCSO supervisors built a tactical plan to subdue Mr. Duran using the PepperBall system, which BCSO perceived to be safer than other alternatives, based on inaccurate information they had received from ATO regarding the product's safety and efficacy. Unfortunately, the PepperBall system did not work as they expected, based on the training and sales information they had received from ATO, and BCSO deputies then fired multiple rounds of PepperBalls at Mr. Duran, in an (ultimately unsuccessful) attempt to subdue him. Many of the PepperBall projectiles tore through Mr. Duran's skin rather than breaking upon impact, as intended. Because the system did not subdue Mr. Duran, even after multiple rounds were fired, BCSO deputies resorted to the use of a police canine, which knocked Mr. Duran down, breaking his hip. He suffered blood loss due to injuries from the PepperBalls. He required increased pain medication and suffered decreased mobility due to his hip fracture and injuries from the PepperBalls. As a result of his hip fracture, lacerations from the PepperBalls, and prior lung and heart conditions, he developed pneumonia. Ultimately, he suffered prolonged respiratory failure and was placed on a ventilator, from the same injuries. He died on October 15, 2015, due to complications of his hip fracture in the setting of heart and lung disease, and according to the Medical Examiner, the wounds of the arms from the PepperBalls were also contributing factors. Based on the above facts, which establish a line of causation from Defendants' acts or omissions to Mr. Duran's injuries, the Court cannot conclude, as a

matter of law, that the acts or omissions of ATO and PCP did not cause Mr. Duran's injuries. Instead, viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that the acts or omissions of ATO and PCP caused his injuries.

### F. The Court will not exclude the Declaration of Chief Deputy Justin Dunlap, ECF No. 141-19.

In their Reply, ECF No. 148 at 2–3,  Defendants argue that the Court should exclude Chief Deputy Dunlap's declaration because, in Defendants' view, the declaration constitutes an attempt to create a sham fact issue by directly contradicting his prior sworn deposition testimony. *Id.* at 2 (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). Having reviewed Defendants Reply, as well as Plaintiffs' Surreply, ECF No. 155 at 2–11, and the applicable law, the Court will not exclude the declaration.

There is authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements. *Franks*, 796 F.2d at 1237 (citing 10A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2738 (2d ed. 1983)). However, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue. *Franks*, 796 F.2d at 1237. The rationale for this rule is that "the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contracting his own prior testimony." *Id.* "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the

affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.*

The Court agrees with Plaintiffs that Chief Deputy Dunlap's declaration does not create a sham fact issue for purposes of summary judgment. The Court finds that the specific statements referenced in Defendants' Reply, ECF No. 148 at 2–3, do not directly contradict Chief Deputy Dunlap's prior deposition testimony. *See* Plaintiffs' Surreply, ECF No. 155 at 5–8 (containing a side-by-side comparison of each statement, for reference). None of the statements directly contradict Chief Deputy Dunlap's prior deposition testimony. Even if the statements were directly contradictory (which the Court does not find), then the statements could fairly be read as an attempt to clarify confusion contained in Chief Deputy Dunlap's prior testimony. Therefore, the Court cannot find the existence of sham fact issue, and Chief Deputy Dunlap's declaration will not be excluded on that basis.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, filed on October 29, 2020, ECF No. 124, is hereby **DENIED**.

**IT IS SO ORDERED.**

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE